1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT JOHN PRESTON,

                Plaintiff,

    v.

RYAN BOYER,

                Defendant.

Case No. C16-1106-JCC-MAT

REPORT AND RECOMMENDATION

## I.      INTRODUCTION

Plaintiff Robert Preston proceeds through appointed counsel in this 42 U.S.C. § 1983 action alleging excessive force[1] against Snohomish County Sergeant Ryan Boyer.[2]  Currently before the Court is defendant's motion for summary judgment, which plaintiff opposes.  Having considered the parties' submissions, the oral argument of counsel on April 18, 2018, the balance of the record, and the governing law, the Court recommends that defendant's motion for summary judgment be granted in part and denied in part, as detailed below.

---

[1] Plaintiff has withdrawn his claims that are not based on the Fourth Amendment.  (Dkt. 72 at 18 n. 9.)

[2] Defendant was a deputy at the time of the events giving rise to this lawsuit.

REPORT AND RECOMMENDATION - 1

1

II.    FACTS[3]

2    A.    Burglary investigation

3        On the morning of July 30, 2014, defendant responded to a burglary in Edmonds,

4    Washington.  (Dkt. 71 at 10; Dkt. 53 at ¶ 4; Dkt. 53 at 13.)  The victim reported a blue and white

5    "Next" brand mountain bike with a large aftermarket Schwinn seat was stolen from her garage,

6    along with other items.  (Dkt. 71 at 11; Dkt. 53 at ¶ 4; Dkt. 53 at 13.)  Defendant began an area

7    check for possible suspects and the bicycle.  (Dkt. 71 at 11-12; Dkt. 53 at ¶ 4; Dkt. 53 at 13.)

8        That same morning, plaintiff borrowed a bicycle and went to a nearby Subway to buy

9    coffee and sandwiches for his daughter and an elderly woman for whom he served as a caregiver.

10    (Dkt. 74 at ¶ 2.)  Less than half a mile from the victim's house, defendant encountered plaintiff,[4]

11    who was walking down the sidewalk pushing a "Next" brand bicycle with a large seat.  (Dkt. 71

12    at 12; Dkt. 53 at ¶ 4; Dkt. 53 at 13; Dkt. 74 at ¶ 3.)  Defendant stopped him and asked if the

13    bicycle was his.  (Dkt. 71 at 12-13; Dkt. 53 at ¶ 4; Dkt. 53 at 14; Dkt. 74 at ¶ 3.)  Plaintiff

14    explained that he borrowed the bicycle to get the coffee and sandwiches he was carrying.  (Dkt.

15    74 at ¶ 4.)  According to defendant, plaintiff's demeanor was defensive.  (Dkt. 71 at 13; Dkt. 53

16    at ¶ 4; Dkt. 53 at 13-14.)

17        Defendant detained plaintiff and asked him to sit down and place his hands behind his

18    back.  (Dkt. 53 at ¶ 5; Dkt. 53 at 14; Dkt. 74 at ¶ 4.)  Plaintiff kept pulling his hands forward and

19    telling defendant that he did not do anything.  (Dkt. 71 at 14; Dkt. 53 at ¶ 5; Dkt. 53 at 14.)

20    According to defendant, plaintiff was "super aggressive" but not "combative."  (Dkt. 71 at 14,

21

22    _____
      [3] Unless noted otherwise, the facts are undisputed.

23    [4] Plaintiff is 5 feet, 10 inches tall.  (Dkt. 71 at 82.)  Defendant estimated plaintiff weighed approximately 240
      pounds.  (Dkt. 53 at ¶ 4; Dkt. 53 at 20.)  Defendant is 5 feet, 9 inches tall, weighed about 175 pounds at the time,
      and was physically fit.  (Dkt. 53 at ¶ 21.)

REPORT AND RECOMMENDATION - 2

15.)  Eventually, defendant was able to handcuff plaintiff.  (Dkt. 71 at 14; Dkt. 53 at ¶ 5; Dkt. 53 at 14.)

Defendant asked plaintiff for identification, and he said it was in his wallet, which was in his pocket.  (Dkt. 53 at ¶ 5; Dkt. 53 at 14; Dkt. 74 at ¶ 5.)  Plaintiff's wallet contained identification cards belonging to Joseph Dryden, Kimberly Baker, and Robert Preston.  (Dkt. 71 at 16; Dkt. 53 at ¶ 5; Dkt. 53 at 14; Dkt. 74 at ¶ 5.)  Defendant checked the names in the Washington Crime Information Center ("WCIC") system and discovered that Robert Preston had a felony warrant for property crimes and an officer caution for drug use.[5]  (Dkt. 71 at 17; Dkt. 53 at ¶ 5; Dkt. 53 at 14.)  Plaintiff did not want to go to jail, so he told defendant that he was Joseph Dryden.  (Dkt. 71 at 16; Dkt. 53 at ¶ 5; Dkt. 53 at 14; Dkt. 71 at ¶ 5.)  Defendant verified that the photograph on the Dryden identification card appeared to be plaintiff.  (Dkt. 71 at 16; Dkt. 53 at ¶ 5; Dkt. 53 at 14.)  Defendant then contacted the victim, who came to the scene and retrieved her bicycle.  (Dkt. 53 at 15.)

Defendant placed plaintiff under arrest for possession of stolen property and possession of another's identification and read him his *Miranda* rights.  (Dkt. 53 at ¶ 5; Dkt. 53 at 15; Dkt. 74 at ¶ 7.)  Defendant searched plaintiff and found a number of items, including mail that did not belong to him, but no weapons.  (Dkt. 53 at 15; Dkt. 74 at ¶ 6.)

Plaintiff told defendant that he borrowed the bicycle from a "guy" who was staying at a house down the street.  (Dkt. 53 at ¶ 6; Dkt. 53 at 15.)  Defendant joined with other deputies to contact the residence plaintiff identified.  (Dkt. 53 at 16.)  They located three males in the back of the residence.  (*Id.*)  One of them stated that "Rob" was riding the blue and white bicycle that

---

[5] WCIC does not show pictures of the individuals in the system.

REPORT AND RECOMMENDATION - 3

1    morning. (*Id.*) "Rob's" daughter was also there, and when defendant took her to the patrol car

2    where plaintiff was waiting, she said that plaintiff was not her father. (*Id.* at 17.)

3            After completing his investigation of the residence, defendant returned to his patrol car

4    and informed plaintiff that he had not been able to verify plaintiff's story. (Dkt. 53 at ¶ 6; Dkt.

5    53 at 18.) As they drove to the jail, plaintiff stated repeatedly that he did not steal the bicycle,

6    that he knew who did, and that he was willing to fill out a statement. (Dkt. 53 at ¶ 7; Dkt. 53 at

7    18; Dkt. 74 at ¶ 8.)

8    B.    112th Street Park and Ride

9            At around 1:00 p.m., defendant pulled over at the north end of the 112th Street Park and

10   Ride so plaintiff could fill out a statement. (Dkt. 53 at ¶ 7; Dkt. 53 at 18; Dkt. 52 at 6-10; Dkt.

11   10 at 5-6.) He parked with the front of his vehicle facing north. (Dkt. 74 at ¶ 9.) The park and

12   ride is in the middle of Interstate 5 ("I-5") between the northbound and southbound lanes. (Dkt.

13   52 at 6; Dkt. 74 at ¶ 9.) It can be accessed from I-5 to the east and west, and from an overpass on

14   112th Street to the south. (Dkt. 52 at 6; Dkt. 71 at 83.) There is a wooded area to the north.

15   (Dkt. 52 at 6.)

16           Defendant let plaintiff out of the car, removed his handcuffs, and provided him with a

17   pen, a statement form, and a clipboard. (Dkt. 53 at ¶ 7; Dkt. 53 at 18; Dkt. 74 at ¶ 9.) While

18   plaintiff filled out his paperwork on the vehicle, defendant sorted through the items he recovered

19   from plaintiff. (Dkt. 53 at ¶ 7; Dkt. 53 at 19; Dkt. 74 at ¶ 10.) Among the recovered items was a

20   check addressed to Robert Preston, and defendant also noted that plaintiff's wallet had "Rob"

21   written inside it. (Dkt. 71 at 19; Dkt. 53 at ¶ 8; Dkt. 53 at 19.) Defendant began to suspect

22   plaintiff was not Joseph Dryden. (Dkt. 71 at 19; Dkt. 53 at ¶ 8; Dkt. 53 at 19.) Defendant

23   questioned plaintiff about the wallet, and plaintiff denied that it was his. (Dkt. 71 at 96; Dkt. 53

at ¶ 8; Dkt. 53 at 19; Dkt. 74 at ¶¶ 11-12.)  According to defendant, plaintiff became angry and defensive.  (Dkt. 71 at 96; Dkt. 53 at ¶ 8; Dkt. 53 at 19.)  Defendant continued to sort through the items found on plaintiff, and according to defendant, plaintiff was swearing, verbally aggressive, and began to look around.  (Dkt. 53 at ¶ 8; Dkt. 53 at 19.)  Plaintiff asserts that at no point did he verbally or physically threaten defendant.  (Dkt. 74 at ¶ 13.)  Defendant told plaintiff to be calm and finish his statement.  (Dkt. 71 at 22; Dkt. 53 at 19.)

Defendant went to the computer in his vehicle, looked up a photograph of Robert Preston on the Corrections/Offender Tracking System ("COTS"), and discovered that plaintiff was, in fact, Robert Preston.  (Dkt. 71 at 23; Dkt. 53 at ¶ 9; Dkt. 53 at 19; Dkt. 74 at ¶ 11.)  Standing approximately ten feet from plaintiff, defendant stated that plaintiff was Robert Preston and ordered him to put his hands behind his back and go to his knees.  (Dkt. 71 at 25, 27; Dkt. 53 at ¶ 11; Dkt. 53 at 20; Dkt. 74 at ¶ 12.)  Defendant described plaintiff as standing in a "bladed stance, furiously looking around, and acting very agitated."[6]  (Dkt. 53 at ¶ 11.)  According to defendant, plaintiff "snarled" towards him, said "no," and refused to go to his knees.  (Dkt. 53 at ¶ 12; Dkt. 53 at 20.)  Plaintiff states that at no time did he "snarl" at defendant, stand in an aggressive or threatening manner, or verbally or physically threaten defendant.  (Dkt. 74 at ¶ 13.)  Plaintiff remembers feeling nervous.  (Dkt. 74 at ¶ 14.)

Defendant loudly told plaintiff to go to his knees and informed plaintiff that he had seen plaintiff's photograph.  (Dkt. 53 at 20; Dkt. 74 at ¶ 12.)  Instead of complying with defendant's verbal command, plaintiff moved to the passenger side window to look in at the computer.  (Dkt. 71 at 26; Dkt. 53 at 20; Dkt. 74 at ¶ 12.)  Defendant repeated the order that plaintiff go to his

---

[6] Defendant testified that a "bladed stance" is "much like a boxing stance where the body is turned about 45 degrees from full on."  (Dkt. 53 at ¶ 11.)  According to defendant, it is a "pre-attack indicator," which is an action by the suspect that makes an officer believe the suspect is about to attack.  (Dkt. 71 at 35, 66.)

REPORT AND RECOMMENDATION - 5

1    knees and put his hands behind his back.  (Dkt. 71 at 26; Dkt. 53 at ¶ 12; Dkt. 53 at 20; Dkt. 74

2    at ¶ 12.)

3          By this point, defendant had drawn his Taser and was pointing it at plaintiff.  (Dkt. 53 at

4    ¶ 12; Dkt. 53 at 20.)  Plaintiff went to his knees slowly and defendant instructed him to put his

5    hands behind his back.  (Dkt. 71 at 28, 88; Dkt. 53 at ¶ 12; Dkt. 53 at 20; Dkt. 74 at ¶ 13.)

6    Plaintiff put his left hand behind his back, and defendant grabbed it in an attempt to handcuff

7    him.  (Dkt. 71 at 28-29; Dkt. 53 at ¶ 12; Dkt. 53 at 20.)  Plaintiff pulled his hand away, stood up,

8    and asked why he had to go to his knees.  (Dkt. 71 at 28-29, 87-88; Dkt. 53 at ¶ 12; Dkt. 53 at

9    20; Dkt. 74 at ¶ 13.)

10         Defendant backed away and told plaintiff that he would be tased if he did not listen.

11    (Dkt. 71 at 29; Dkt. 53 at ¶ 12; Dkt. 53 at 20.)  Plaintiff went to his knees again and put his left

12    hand behind his back.  (Dkt. 71 at 29-30; Dkt. 53 at ¶ 12; Dkt. 53 at 20.)  Defendant grabbed

13    plaintiff's left hand again, but plaintiff pulled his arm away and stood up.  (Dkt. 71 at 29-30; Dkt.

14    53 at ¶ 12; Dkt. 53 at 20.)  Plaintiff turned towards defendant, who ordered, "GO TO YOUR

15    KNEES NOW."  (Dkt. 53 at 20.)  Plaintiff did not comply and stood at an angle from defendant,

16    asking why he needed to go to his knees and whether he was being arrested.[7]  (Dkt. 71 at 31, 34,

17    90; Dkt. 53 at ¶ 12; Dkt. 53 at 20; Dkt. 74 at ¶ 13.)

18         Defendant deployed his Taser, and the barbs hit the front of plaintiff's torso.  (Dkt. 71 at

19    31, 36, 89; Dkt. 53 at ¶ 12; Dkt. 53 at 20; Dkt. 10 at 5; Dkt. 74 at ¶ 15.)  Plaintiff went to the

20    ground slowly and managed to pull the darts from his body.  (Dkt. 71 at 91; Dkt. 53 at ¶ 12; Dkt.

21

22

23    [7] Defendant's incident report describes plaintiff as standing at an "angle."  (Dkt. 53 at 20.)  Defendant's testimony
describes plaintiff as standing in a "bladed stance," which is a pre-attack indicator.  (Dkt. 53 at ¶ 11.)  As noted
above, plaintiff's testimony is that he never stood in an aggressive or threatening manner.  (Dkt. 74 at ¶ 13.)

53 at 20; Dkt. 10 at 5; Dkt. 74 at ¶ 15.)  Plaintiff got up and ran west or northwest through the park and ride.[8]  (Dkt. 53 at ¶ 12; Dkt. 53 at 20; Dkt. 74 at ¶ 15.)

Defendant testified that he was concerned about the safety of the general public at the park and ride and also drivers on I-5, which was less than 50 yards away.  (Dkt. 71 at 46-47; Dkt. 53 at ¶ 14.)  Plaintiff testified that although he did not have a plan for where he was running, he never ran toward or got anywhere near the freeway.  (Dkt. 74 at ¶ 15.)

Defendant pursued plaintiff, ordering him to go to the ground.  (Dkt. 53 at ¶ 15; Dkt. 53 at 20.)  Plaintiff continued to run, and defendant requested backup; it was 1:06 p.m.  (Dkt. 53 at 20; Dkt. 73 at 94.)  Defendant reloaded his Taser and when he was approximately 20 feet away, he tased plaintiff while plaintiff was running.[9]  (Dkt. 71 at 93, 96; Dkt. 53 at ¶ 15; Dkt. 53 at 20; Dkt. 10 at 5-6; Dkt. 74 at ¶ 16.)  Defendant then requested expedited backup and aid personnel. (Dkt. 53 at 20.)

The events that occurred next form the basis for plaintiff's excessive force claim and are disputed by the parties.

C.    Defendant's testimony regarding alleged excessive force

Defendant averred that when plaintiff was tased the second time, he "locked up and fell," landing on the front of his body, his face hitting the concrete.[10]  (Dkt. 53 at ¶ 15; Dkt. 53 at 20; *see also* Dkt. 71 at 49.)  Defendant ordered plaintiff to stay on the ground.  (Dkt. 71 at 52; Dkt.

---

[8] According to defendant, plaintiff ran around the rear bumper of the patrol car on the south side of the vehicle and turned westbound through the park and ride.  (Dkt. 71 at 42-43; Dkt. 53 at ¶ 13.)  Plaintiff testified, however, that he ran around the front bumper on the north side of the vehicle before turning west or northwest.  (Dkt. 71 at 92; Dkt. 74 at ¶ 15.)

[9] Plaintiff testified that he is not a fast runner, and he was still getting up speed when he was tased in the back.  (Dkt. 71 at 96, 101; Dkt. 74 at ¶ 16.)

[10] Defendant testified at his deposition, however, that it was "possible" plaintiff fell on his hands and knees and then slid forward onto his body.  (Dkt. 71 at 49.)

REPORT AND RECOMMENDATION - 7

1    53 at ¶ 15; Dkt. 53 at 21.)  Plaintiff had started to bleed from his face area, likely from landing on

2    the ground.  (Dkt. 71 at 49-51; Dkt. 53 at 21.)  Plaintiff tried to get up.  (Dkt. 71 at 51

3    (defendant's testimony that plaintiff was "slow to get up"); Dkt. 53 at ¶ 15; Dkt. 53 at 21.)

4         Defendant tried to take control by putting his knee on plaintiff's back and grabbing

5    plaintiff's arm.  (Dkt. 71 at 52-53; Dkt. 53 at ¶ 15; Dkt. 53 at 21.)  Plaintiff pulled his arm away

6    and started to get up.  (Dkt. 71 at 53; Dkt. 53 at ¶ 15; Dkt. 53 at 21.)  Defendant reactivated his

7    Taser and accidentally tased himself.  (Dkt. 71 at 53-54; Dkt. 53 at ¶ 15; Dkt. 53 at 21.)

8    Defendant turned off his Taser and told plaintiff to stay on the ground.  (Dkt. 53 at 21.)

9         Plaintiff tried to get up again with defendant on his back.  (Dkt. 71 at 55; Dkt. 53 at ¶ 15;

10   Dkt. 53 at 21.)  Defendant delivered a compliance strike to the back of plaintiff's head, using the

11   front part of his Taser.  (Dkt. 71 at 55, 57; Dkt. 53 at ¶ 16; Dkt. 53 at 21.)  Defendant backed

12   away from plaintiff and yelled for him to stay down and stop resisting.  (Dkt. 71 at 57; Dkt. 53 at

13   ¶ 16; Dkt. 53 at 21.)  Plaintiff tried to get up again, and defendant delivered a second compliance

14   strike to the back of plaintiff's head with his Taser, and then backed away to assess.  (Dkt. 71 at

15   57-58, 62; Dkt. 53 at ¶ 16; Dkt. 53 at 21.)

16        Defendant ordered plaintiff to stay on the ground, but plaintiff tried to get up again.  (Dkt.

17   71 at 58, 62; Dkt. 53 at ¶ 16; Dkt. 53 at 21.)  Defendant delivered a foot strike to the right side of

18   plaintiff's body, backed away, and gave additional verbal commands.  (Dkt. 71 at 58, 62; Dkt. 53

19   at ¶ 17; Dkt. 53 at 21.)  Plaintiff tried to get up again, and after he failed to obey defendant's

20   verbal commands to stay on the ground, defendant delivered a second foot strike to the right side

21   of his body.  (Dkt. 71 at 59-60, 62-64; Dkt. 53 at ¶ 17; Dkt. 53 at 21.)  Defendant backed up, and

22   when plaintiff still did not give up, defendant delivered a third foot strike to his side body.  (Dkt.

23

71 at 64.)  Defendant drew his duty weapon and told plaintiff to stay on the ground.  (Dkt. 53 at 22.)

D.    <u>Plaintiff's testimony regarding alleged excessive force</u>

Plaintiff testified that when he was tased in the back, he went down on his knees; he did not fall forward into his face.  (Dkt. 71 at 98; Dkt. 10 at 5-6; Dkt. 74 at ¶ 16.)  Defendant then ran and kicked him in the back, which sent him "sliding forward to the right side of [his] body," causing road rash on his right wrist and arm area and slightly scraping his chin.  (Dkt. 10 at 5; *see also* Dkt. 71 at 99-100; Dkt. 74 at ¶ 17.)  Defendant told him to stay down.  (Dkt. 71 at 100.)

Plaintiff has provided slightly different accounts about what happened next.  In his verified complaint, he stated, "As I then *started to push my upper body up*, Deputy Boyer jumped on my back and began to beat me in the back of the head with his taser gun in hand." (Dkt. 10 at 6 (emphasis added).)  Plaintiff's declaration, however, states, "As I *laid there on my stomach*, Deputy Boyer jumped on my back and hit me in the back of my head with the Taser." (Dkt. 74 at ¶ 18 (emphasis added); *see also* Dkt. 71 at 73 (plaintiff's deposition testimony that defendant kicked him in the back and then immediately got on top of him and began hitting him with the Taser).)  Defendant struck plaintiff two or three times with the Taser, causing puncture wounds on the back of plaintiff's head and partially severing his right ear.  (Dkt. 10 at 5-6; Dkt. 74 at ¶ 18.)

Defendant then got up and yelled at plaintiff to place his hands behind his back.  (Dkt. 10 at 6; *see also* Dkt. 74 at ¶ 18.)  Blood from plaintiff's ear was running into his eyes, and he reached his hand up to wipe his face.  (Dkt. 71 at 103, 105; Dkt. 10 at 6-7; Dkt. 74 at ¶ 19.) Defendant kicked him in the forehead area, causing a gash above his right eye.  (Dkt. 71 at 104; Dkt. 10 at 7; Dkt. 74 at ¶¶ 20, 22.)  Defendant immediately kicked him again, this time in his

1   mouth area, knocking out a front tooth, tearing apart his upper and lower lips, breaking his nose,

2   knocking him unconscious, and causing him to have a seizure.  (Dkt. 71 at 104-05; Dkt. 10 at 5,

3   7, 9; Dkt. 74 at ¶¶ 20, 22.)  Plaintiff does not remember anything else until he woke up over a

4   day later in the intensive care unit at a hospital in Everett.  (Dkt. 71 at 104-05; Dkt. 10 at 7; Dkt.

5   74 at ¶ 20.)

6          From the time defendant jumped on plaintiff's back until the time plaintiff passed out, he

7   remained flat on the ground and did not try to get up.  (Dkt. 74 at ¶ 20.)  Plaintiff also avers that

8   he never tried to harm defendant in any way and was never aggressive or threatening.  (Dkt. 74 at

9   ¶ 24; Dkt. 10 at 13; *see also* Dkt. 71 at 60-61 (defendant's testimony that plaintiff never tried to

10  hit him).)

11  E.      Subsequent events

12         At 1:08 p.m., approximately two minutes after defendant first radioed for backup,

13  Captain Jeffery Miller arrived at the scene.  (Dkt. 71 at 64; Dkt. 53 at ¶ 17; Dkt. 53 at 22; *see*

14  *also* Dkt. 73 at 88, 90, 95.)  He observed that defendant had his Taser deployed and plaintiff was

15  "rolling from back to front and flailing his arms."  (Dkt. 73 at 88.)  Captain Miller exited his

16  vehicle and placed a control hold on plaintiff's feet and legs.  (*Id.*)  He told plaintiff several times

17  to lie on his stomach and place his hands behind his back.  (*Id.*)  Plaintiff slowly complied with

18  Captain Miller's instructions and defendant handcuffed him.  (*Id.*)

19         Moments later, Captain Robert Palmer arrived at the scene.  (Dkt. 79 at ¶ 4.)  He testified

20  that plaintiff was conscious at the time, "spewing vitriol at the officers who had him in custody,

21  and complaining about his injuries."  (*Id.*)  Deputy Luis Zelaya also arrived at the scene and

22  reported that plaintiff "was in and out of consciousness."  (Dkt. 73 at 90.)

23

The Everett Fire Department arrived at 1:15 p.m. and called for additional medical support.  (Dkt. 73 at 100.)  Paramedics arrived at 1:25 p.m. and performed an initial assessment of plaintiff's vitals.  (Dkt. 73 at 114, 116.)  They reported that plaintiff's head was covered in blood, he was unresponsive, and he had a Glasgow Coma Scale ("GCS") score of 8, which meant that he was in a coma.  (Dkt. 73 at 114-15; Dkt. 75 at ¶¶ 35-38.)  At 1:34 p.m., they administered a sedative intravenously and then intubated him.  (Dkt. 73 at 114-15.)  Prior to intubation, they found part of plaintiff's missing tooth in the back of his throat.  (Dkt. 73 at 114.)  At 1:42 p.m., paramedics left the scene and transported plaintiff to the hospital on an Advanced Life Support Code, which is used whenever a patient has a potentially life-threatening injury.  (Dkt. 73 at 116, 122-23.)

Officer Christopher Leyda, who arrived at the scene after plaintiff was in custody, followed the ambulance to the hospital.  (*See* Dkt. 73 at 103.)  There, he photographed plaintiff's injuries.  (*Id.*)  He stayed at the hospital until he was informed that plaintiff would not be booked on the outstanding warrants.  (*Id.*)  In his report, he noted that plaintiff "was unconscious during my entire interaction with him, therefore I did not question him, nor did he state anything to my knowledge."  (*Id.*)

The next day, plaintiff woke up in the hospital hooked up to a machine, and he remained there for a week.  (Dkt. 74 at ¶ 21; Dkt. 10 at 8.)  He had suffered injuries to his forehead, ear, tooth, nose, lips, back of head, ribs, and right knee.  (Dkt. 74 at ¶¶ 22, 25; Dkt. 10 at 9-10.)  Plaintiff has permanent scarring on his face, permanent vision impairment, migraines, nightmares, and recurring knee pain.  (Dkt. 74 at ¶ 25; Dkt. 10 at 13.)

1

III.    SUMMARY JUDGMENT STANDARD

2    Summary judgment is appropriate when the "movant shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

4    R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The central issue is

5    "whether the evidence presents a sufficient disagreement to require submission to a jury or

6    whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

7    251-52.

8    The moving party bears the initial burden of showing "that there is an absence of

9    evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

10    (1986).  Where the moving party does not bear the burden at trial, as in this case, it can carry its

11    initial burden by presenting evidence that negates an essential element of the nonmoving party's

12    case, or by establishing that the nonmovant lacks the quantum evidence needed to satisfy its

13    burden at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th

14    Cir. 2000).

15    If the moving party meets its initial responsibility, the burden then shifts to the

16    nonmoving party to establish a genuine issue of material fact for trial.  *Matsushita Elec. Indus.*

17    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  Genuine disputes are those for which

18    the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

19    *Anderson*, 477 U.S. at 257.  Material facts are those which might affect the outcome of the suit

20    under governing law.  *Id.*

21    In ruling on a motion for summary judgment, the Court must construe the facts and draw

22    all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S.

23

1  at 587, and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S.

2  at 248.

3  IV.    DISCUSSION

4  A.    Evidentiary disputes

5          As an initial matter, the parties dispute what evidence should be credited in ruling on the

6  motion for summary judgment.

7          1.    *Defendant's motion to strike under the sham affidavit rule*

8          Defendant argues that the Court should apply the sham affidavit rule and strike portions

9  of plaintiff's declaration.  (Dkt. 77 at 5-6.)  The general rule is that "a party cannot create an

10  issue of fact by an affidavit contradicting his prior deposition testimony."  *Yeager v. Bowlin*, 693

11  F.3d 1076, 1080 (9th Cir. 2012) (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th

12  Cir. 2009)).  The sham affidavit rule prevents "a party who has been examined at length on

13  deposition from raising an issue of fact simply by submitting an affidavit contradicting his own

14  prior testimony, which would greatly diminish the utility of summary judgment as a procedure

15  for screening out sham issues of fact."  *Id.* (internal quotation, citation, and alteration omitted).

16          The rule is "limited to prior statements made under oath."  *Jackson v. Cnty. of San*

17  *Bernadino*, 191 F. Supp. 3d 1100, 1109 (C.D. Cal. 2016) (citing *Leslie v. Grupo ICA*, 198 F.3d

18  1152, 1158 (9th Cir. 1999)); *see also Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 980

19  (9th Cir. 2006) (characterizing *Leslie* as "holding that a sworn statement by a non-movant must

20  be accepted as true on summary judgment unless the statement contradicts other sworn

21  statements by the non-movant").  It "should be applied with caution because it is in tension with

22  the principle that the court is not to make credibility determinations when granting or denying

23  summary judgment."  *Yeager*, 693 F.3d at 1080 (internal quotation and citation omitted).  Thus,

REPORT AND RECOMMENDATION - 13

1  before applying the rule, "the district court must make a factual determination that the

2  contradiction is a sham, and the inconsistency between a party's deposition testimony and

3  subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.*

4  (internal quotation and citation omitted).

5  First, defendant argues that plaintiff's declaration is inconsistent with statements he made

6  to medical providers, statements he made in an October 2015 "declaration" he submitted with a

7  damages claim, and a supplemental "facts" statement for his damages claim. (Dkt. 77 at 5-6.)

8  The materials submitted to the Court do not establish that these statements were made under oath

9  (*see* Dkt. 78; Dkt. 81 at 5-17), and therefore they cannot form a basis for invoking the sham

10  affidavit rule.[11] *See Leslie*, 198 F.3d at 1158.

11  Second, defendant contends that plaintiff's declaration contradicts his verified amended

12  complaint, which states, "As I then started to push my upper body up, Deputy Boyer jumped on

13  my back and began to beat me in the back of the head with his taser gun in hand." (Dkt. 10 at 6.)

14  Plaintiff's declaration states, "As I laid there on my stomach, Deputy Boyer jumped on my back

15  and hit me in the back of my head with the Taser." (Dkt. 74 at ¶ 18.) Plaintiff's declaration also

16  states, "From the time Deputy Boyer jumped on my back to the time I passed out, I remained flat

17  on the ground and did not try to get up." (Dkt. 74 at ¶ 20.)

18

19

20

21  [11] At oral argument, defendant's counsel indicated that the damages claim documents were made under oath, but the excerpts before the Court do not confirm this. Counsel also argued that the sham affidavit rule does not require a statement to be made under oath, citing *Block v. City of Los Angeles*, 253 F.3d 410 (9th Cir. 2001). In *Block*, the

22  Ninth Circuit held that the district court abused its discretion by relying on an affidavit that was not based on personal knowledge, as required by Federal Rule of Civil Procedure 56. *Id.* at 419. In a footnote, the court also noted that the affidavit contradicted stipulated facts. *Id.* at 419 n.2. The court noted that a party is normally bound

23  by its stipulation of facts and cannot create a genuine issue of material fact by contradicting its earlier version of the facts. *Id.* To the extent *Block* extended the sham affidavit rule to stipulations, it did so in dicta. And unlike *Block*, this case does not involve stipulated facts. Therefore, the Court finds it inapplicable.

REPORT AND RECOMMENDATION - 14

1    Plaintiff's verified complaint was made under penalty of perjury (Dkt. 10 at 4); *see also*

2    *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (a verified complaint "may be treated as

3    an affidavit to oppose summary judgment to the extent it is based on personal knowledge and

4    sets forth specific facts admissible in evidence") (internal quotations omitted), and therefore it

5    may be used as a basis for invoking the sham affidavit rule.  The Court finds a clear and

6    unambiguous contradiction between plaintiff's verified amended complaint and paragraph 18 of

7    his declaration.  He originally stated that he started to push himself up before Deputy Boyer

8    jumped on his back, and then he changed his story and stated that he was lying on his stomach

9    when Deputy Boyer jumped on him.  Plaintiff has offered no explanation for this contradiction.

10   The Court finds that this contradiction is a sham and paragraph 18 of plaintiff's declaration

11   should be stricken.

12       There is no clear and unambiguous contradiction, however, between plaintiff's verified

13   amended complaint and paragraph 20 of his declaration.  According to the verified amended

14   complaint, plaintiff pushed up *before* defendant jumped on his back.  According to paragraph 20,

15   plaintiff did not try to get up once defendant jumped on his back.  When read closely, it is

16   apparent that the two statements address different periods of time.  Therefore, the sham affidavit

17   rule does not apply.

18       Third, defendant asserts that plaintiff's statement in his declaration that defendant was

19   "screaming" at him as defendant hit him with the Taser (Dkt. 74 at ¶ 18) contradicts the

20   statement in his verified amended complaint that after defendant hit him with the Taser,

21   defendant "then got up yelling at me to place my hands behind my back" (Dkt. 10 at 6).  (Dkt. 77

22   at 6.)  These statements are not contradictory because they address different moments in time:

23   the declaration addresses what was happening while defendant was hitting plaintiff with the

REPORT AND RECOMMENDATION - 15

Taser, and the verified amended complaint addresses what happened after defendant stopped

hitting plaintiff and got up.  The sham affidavit rule does not apply.

Fourth, defendant contends that plaintiff has changed his story regarding the direction he

was running when he tried to escape.  (Dkt. 77 at 6.)  At his deposition, plaintiff testified that he

did not formulate a plan regarding where to run, and he stated that he was heading "northwest"

or "west, northwest."  (Dkt. 71 at 94-95.)  In a *pro se* responsive brief filed in this action,

plaintiff stated, "I only ran around the front of the patrol car and about 6 strides before being shot

again with the taser gun.  I would like to note I was headed for the wooded section of the park-n-

ride."  (Dkt. 59 at 4.)  In his declaration, he states that after he pulled out the barbs from the first

tasing,

> I then turned towards the front of the car and ran northwest away from Deputy
> Boyer.  I was trying to get away from Deputy Boyer because I was in fear, and
> there were woods on the north end of the Park and Ride.  Although I did not have
> a plan for where I was going, I was certainly not going to run across the freeway,
> as Deputy Boyer claims.  I was trying to avoid going to jail, not trying to get
> myself killed.  I never ran toward or got anywhere near the freeway.

(Dkt. 74 at ¶ 15.)

Plaintiff's *pro se* responsive brief was not made under oath, and therefore it does not

provide grounds for invoking the sham affidavit rule.  *See Leslie*, 198 F.3d at 1158.  The sham

affidavit rule also does not apply to plaintiff's deposition testimony and declaration because they

are not contradictory.  At his deposition, plaintiff said that he did not formulate a plan about

where he was running.  His declaration offers additional explanation of this statement, saying

that he was not going to run across the freeway.  Parties are permitted to explain or attempt to

resolve contradictions with reasonable explanations.  *Yeager*, 693 F.3d at 1081 (citing *Cleveland

v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999)).  Plaintiff's explanation is reasonable.

Likewise, plaintiff is not inconsistent about the direction he was running.  At his deposition, the following exchange occurred:

Q.  So that northwest direction was just kind of what was open?  West, northwest?

A.  It just happened to be the way that I –

Q.  Away from him?

A.  Yeah.  When I turned and run around the car, it just happened to be the way that was farthest from him.

(Dkt. 71 at 95.)  This testimony does not create a clear and unambiguous inconsistency with his statement in his declaration that he ran "northwest."

Additionally, the record does not justify application of the sham affidavit rule to strike plaintiff's statement in his declaration that he "never ran toward or got anywhere near the freeway."  A reasonable interpretation of this statement is that plaintiff was not heading to the freeway.  This statement is not contradicted by any other statement made under oath.

In sum, defendant's motion to strike under the sham affidavit rule should be GRANTED as to paragraph 18 of plaintiff's declaration and DENIED as to the remaining issues.

2.    *Defendant's challenge to plaintiff's statement that he was non-threatening*

Defendant argues that plaintiff "self-servingly claims that he did not mean to convey any threatening or intimidating manner in his stance . . . ."  (Dkt. 77 at 4.)  According to defendant, plaintiff's subjective intent was not knowable to defendant and thus cannot be considered in the summary judgment context.  (*Id.*)  Defendant also contends that plaintiff's statement that he was not threatening is conclusory and therefore insufficient to justify denial of summary judgment.  (*Id.*)  The Court is not persuaded.  Plaintiff's declaration states, "Despite what Deputy Boyer claims, at no time did I 'snarl' at him or stand in an aggressive or threatening manner.  At no time did I verbally or physically threaten Deputy Boyer."  (Dkt. 74 at ¶ 13.)  Plaintiff's

1    statements do not address his intent; rather, he simply states what he did not do.  His statements

2    are not so conclusory that they must be disregarded by the Court in ruling on his motion for

3    summary judgment.

4        3.    *Defendant's challenge to plaintiff's assertion that he was unconscious or helpless*

5        In his reply brief, defendant argues that there is no evidence to support plaintiff's claim

6    that he was unconscious and/or helpless at any time force was used on him.  (Dkt. 77 at 12.)

7    Defendant notes that plaintiff himself does not recall and other witnesses, including Captain

8    Palmer, noted that he was conscious prior to the arrival of the paramedics.  (*Id.*)

9        However, plaintiff's medical expert, Dr. Barry Gustin, opined that plaintiff was rendered

10    unconscious by defendant's second kick to the face.  (Dkt. 75 at ¶¶ 6, 34, 39, 42; *see also* Dkt. 73

11    at 130-31.)  Dr. Gustin explained,

12        Decreasing mental status subsequent to blunt force head trauma occurs only when
         there is worsening intracranial abnormalities over time, such as an expanding
13        hematoma and increased brain swelling.  Mr. Preston's medical records show
         there was no acute intracranial abnormality, which means he did not have an
14        expanding hematoma or increased brain swelling over time.  *See* Providence
         Medical Records at page 5.  Therefore, Mr. Preston's loss of consciousness would
15        have occurred immediately after sustaining blunt force trauma to the face and
         head.  Since there was a period of time that Mr. Preston was conscious after being
16        tased (including, at least according to Officer Boyer, the ability to resist arrest), it
         is more likely than not that Mr. Preston lost consciousness as a result of
17        subsequent kicks to the face.

18    (Dkt. 75 at ¶ 34.)  Dr. Gustin's opinion is supported by the fact that paramedics found part of

19    plaintiff's broken tooth lodged in the back of his throat.  (*See* Dkt. 73 at 114.)  Dr. Gustin opined

20    that if plaintiff had been conscious at the time his tooth was knocked out, his natural gag reflex

21    would have kicked in and he would have spat it out.  (Dkt. 75 at ¶ 39; Dkt. 73 at 130-31.)  Dr.

22    Gustin also opined that Captain Miller's observation that plaintiff was rolling from back to front

23    and flailing his arms does not mean that plaintiff was conscious; he could have been unconscious

REPORT AND RECOMMENDATION - 18

1    and merely moving because of pain and/or the force of defendant's kicks.  (Dkt. 75 at ¶ 38.)

2    Viewing the evidence in plaintiff's favor, Dr. Gustin's testimony is sufficient to create a genuine

3    issue of material fact regarding whether plaintiff was knocked unconscious by the alleged kicks

4    to his face.

5        4.    *Plaintiff's evidentiary challenges*

6        Plaintiff challenges the following statements in defendant's declaration:  (1) "I was

7    concerned for my safety due to Preston's felony warrant that he was trying to hide from, his

8    attempts to conceal his identity, *the officer safety cautions*, and his unstable demeanor" (Dkt. 53

9    at ¶ 10 (emphasis added)); (2) before the first tasing, plaintiff was standing in a "bladed stance,"

10   which is a pre-attack indicator (*id.* at ¶ 11); and (3) "I was concerned about the safety of the

11   general public at the park and ride, and also drivers on Interstate 5 (I-5). . . .  If I had let him go,

12   he not only would have put him and me in danger, but also members of the traveling public" (*id.*

13   at ¶ 14).  (Dkt. 72 at 14-16.)  Plaintiff argues that none of these statements are reflected in

14   defendant's police reports about the incident, and therefore, the Court should disregard them

15   because whether they were a part of defendant's calculus at the time or instead were identified

16   after the fact or in the development of a litigation defense turns on defendant's credibility.  (*Id.* at

17   15.)  The Court will consider each challenged statement in turn.

18       Plaintiff asserts that defendant reasonably noted the drug-use caution in his police report

19   because it was flagged with stars near the top of the WACIC profile, but he did not note the

20   officer safety notice, which was more than a dozen lines down in the profile.  (*Id.* at 16, 16 n.6.)

21   Plaintiff also points out that defendant mentioned the drug use caution during his deposition, but

22   not the officer safety caution.  (Dkt. 72 at 16 (citing Dkt. 73 at 11-12).)  Plaintiff, however,

23   disputes a fact that is not material to the outcome of this case.  Even excluding the officer safety

REPORT AND RECOMMENDATION - 19

1   caution, defendant's statement that he was concerned for his safety is amply supported by the

2   felony warrant plaintiff was trying to avoid; plaintiff's attempts to conceal his identity; the drug

3   use caution, which defendant explained contributed to his "heightened awareness" and was likely

4   the result of "bad contact" between plaintiff and law enforcement (Dkt. 73 at 11-12)); and

5   plaintiff's demeanor, which defendant described as "unstable" (Dkt. 53 at ¶ 10) and plaintiff

6   described as "nervous" (Dkt. 74 at ¶ 14).

7          With respect to the alleged "bladed" stance, plaintiff argues that defendant's declaration

8   is at odds with his report, which described plaintiff as standing at an "angle." (Dkt. 72 at 15.)

9   According to plaintiff, standing at an angle could signal that a suspect is considering escape, not

10  attack. (*Id.*) Regardless, as plaintiff recognizes, there is a factual dispute regarding plaintiff's

11  stance because he avers that at no time did he "stand in an aggressive or threatening manner."

12  (Dkt. 74 at ¶ 13.) For purposes of summary judgment, plaintiff's testimony must be credited

13  over defendant's.

14         With respect to defendant's alleged concern for public safety, plaintiff argues that this

15  testimony should not be credited because defendant never discussed it in his original reports.

16  (Dkt. 72 at 15.) Plaintiff maintains that a reasonable jury could conclude that defendant's public

17  safety justification is implausible, particularly since plaintiff never got close to the freeway. (*Id.*)

18  Although defendant's claimed concern for public safety is not corroborated by his reports, it is

19  undisputed. Accordingly, it will be credited in ruling on summary judgment. *See Nigro v. Sears,*

20  *Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court cannot disregard evidence at the

21  summary judgment stage solely based on its self-serving nature, even if it is uncorroborated).

22         Plaintiff also contends that defendant improperly relies on disputed facts when he argues

23  that photographs of plaintiff's pants and knees do not "show marks which would be consistent

REPORT AND RECOMMENDATION - 20

1   with a fall to the knees while running."  (Dkt. 72 at 16 (quoting Dkt. 70 at 9); *see also* Dkt. 54 at

2   6-10.)  The photographs do not "blatantly contradict[]" plaintiff's testimony that he fell to his

3   knees after the second tasing.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Accordingly, the

4   question of whether plaintiff fell to his knees, as he claims, or fell forward onto his face, as

5   defendant claims, is a disputed issue of material fact that must be construed in plaintiff's favor

6   on summary judgment.

7           5.      *Summary of material facts, construed in the light most favorable to plaintiff*

8           As previously stated, the Court must construe the disputed facts in plaintiff's favor when

9   considering defendant's motion for summary judgment.  Thus, the material facts, construed in

10  plaintiff's favor, are as follows.  Defendant lawfully arrested plaintiff for possession of stolen

11  property and possession of another's identification.  Defendant searched plaintiff and found no

12  weapons.  Plaintiff lied about his identity to avoid defendant discovering that he had felony

13  warrants for nonviolent property crimes and an officer caution.  Defendant pulled over at the

14  park and ride so plaintiff could write a statement identifying the bicycle thief, let plaintiff out of

15  the car, and took off his handcuffs.  Defendant discovered that plaintiff lied about his identity

16  and that he had felony warrants for nonviolent property crimes and an officer caution.  Defendant

17  felt concerned for his safety because of the felony warrant plaintiff was trying to avoid,

18  plaintiff's attempts to conceal his identity, the officer caution, and plaintiff's demeanor.  In

19  addition, although defendant is physically fit, plaintiff was at least 35 pounds heavier than

20  defendant.

21          When defendant confronted plaintiff about his identity, he did not comply with

22  defendant's commands to put his hands behind his back and go to his knees.  Plaintiff felt

23  nervous, but at no time did he "snarl" at defendant, stand in an aggressive or threatening manner,

1    or verbally or physically threaten defendant. Defendant drew his Taser and pointed it at plaintiff.

2    Plaintiff went to his knees, and defendant instructed him to put his hands behind his back.

3    Plaintiff put one hand behind his back, but when defendant tried to handcuff him, he pulled

4    away, stood up, and asked why he had to go to his knees. Defendant backed away and warned

5    plaintiff that he would be tased if he did not listen. Plaintiff went to his knees again and put a

6    hand behind his back, but when defendant went to handcuff him, he stood up again and

7    continued to argue.

8    Defendant deployed his Taser and hit the front of plaintiff's torso. Plaintiff pulled out the

9    darts and turned and ran northwest through the park and ride. Plaintiff was not running fast.

10   Defendant pursued, feeling concerned about the safety of the general public. They were about

11   50 yards from I-5. Defendant ordered plaintiff to the ground, but plaintiff continued to run.

12   Defendant tased plaintiff and plaintiff fell to his knees. Defendant ran up and kicked plaintiff in

13   the back, which sent him sliding forward on the right side of his body. Defendant told him to

14   stay down, but he started to push himself up. Defendant jumped on his back and then hit him

15   two or three times in the back of the head with the Taser. One strike made a puncture wound on

16   the back of plaintiff's head and another partially severed his right ear.

17   Defendant got up and yelled at plaintiff to put his hands behind his back. Plaintiff

18   reached his hand up to wipe blood that was dripping down his face. Defendant kicked him in the

19   forehead area and then immediately kicked him again in his mouth area. Plaintiff lost

20   consciousness. Between the time defendant jumped on plaintiff's back and the time plaintiff lost

21   consciousness, plaintiff never tried to get up.

22   Defendant then kicked plaintiff three times in the side. He drew his duty weapon and

23   pointed it at plaintiff. Backup arrived; it was approximately two minutes after defendant first

1   radioed for help.  The first on the scene, Captain Miller, observed plaintiff rolling from front to

2   back and flailing his arms.  Plaintiff was unconscious, however, and his movements were due to

3   pain and/or the force of defendant's kicks.

4   Captain Miller helped defendant handcuff plaintiff.  Paramedics arrived and performed an

5   initial assessment of plaintiff's vitals.  Plaintiff was covered in blood, in a coma, and had a

6   broken tooth lodged in the back of his throat.  Plaintiff was transported to the hospital on an

7   Advanced Life Support Code, which is used whenever a patient has a potentially life-threatening

8   injury.  Plaintiff woke up the next day in the hospital, hooked up to a machine, and was

9   discharged a week later.  Plaintiff suffered injuries to his forehead, ear, tooth, nose, lips, back of

10  head, ribs, and right knee.  Plaintiff has permanent scarring on his face and hand, permanent

11  vision impairment, migraines, nightmares, and recurring knee pain.

12  B.    Defendant's motion for summary judgment

13  Defendant contends he is entitled to summary judgment based on qualified immunity.

14  The doctrine of qualified immunity protects government officials from civil liability under

15  § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of

16  which a reasonable person would have known."  *Stanton v. Sims*, 134 S. Ct. 3, 4-5 (2013) (per

17  curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Kisela v. Hughes*,

18  138 S. Ct. 1148, 1152 (2018).  "Qualified immunity gives government officials breathing room

19  to make reasonable but mistaken judgments about open legal questions" and "protects 'all but the

20  plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S.

21  731, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

22  "To determine whether an officer is entitled to qualified immunity, a court must evaluate

23  two independent prongs:  (1) whether the officer's conduct violated a constitutional right, and (2)

whether that right was clearly established at the time of the incident." *Castro v. Cnty. of L.A.*, 797 F.3d 654, 663 (9th Cir. 2015) (citing *Pearson*, 555 U.S. at 232).

With respect to the first prong, plaintiff alleges that defendant violated his Fourth Amendment right to be free from the unreasonable use of force. *See Graham v. Connor*, 490 U.S. 386 (1989) (Fourth Amendment prohibits unreasonable use of force by law enforcement officers in the course of an arrest); *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc). "[O]fficers may only use such force as is 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 397). On summary judgment, whether an officer used objectively reasonable force is a question for the Court—not a jury—to decide after viewing the disputed issues of material fact and drawing all reasonable inferences in plaintiff's favor. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

To determine whether the force allegedly used was objectively reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. In other words, the Court weighs the type and amount of force inflicted against the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, and any other relevant factors. *See id.*; *Jackson*, 268 F.3d at 651-52; *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Officers are not required to use "the least intrusive means available so long as they act within a range of reasonable conduct." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011).

With respect to the second prong of the qualified immunity analysis, the question before the Court is whether the right to be free from the allegedly excessive force was clearly established at the time of the incident. *Saucier*, 533 U.S. at 201. In other words, the Court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202; *see also Kisela*, 138 S. Ct. at 1153 ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.").

"Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S. Ct. at 1152 (quoted source omitted, alteration added). The Supreme Court's "caselaw does not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoted source omitted). It is plaintiff's burden to establish that the law was clearly established at the time of the incident in July 2014. *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated in part by Greene v. Camreta*, 661 F.3d 1201 (9th Cir. 2011).

Although the two prongs of the qualified immunity analysis are independent, the type and amount of force allegedly used is relevant to determining whether the officer had fair notice that his conduct was unreasonable.

As plaintiff's counsel clarified during oral argument, plaintiff claims that defendant used excessive force when defendant hit him with the Taser in the back of the head, kicked him in the face, kicked him in the side, and pointed a gun at him. Viewing the evidence in plaintiff's favor, the Court concludes defendant acted within the range of reasonable conduct when he hit plaintiff

1    with the Taser, but violated plaintiff's Fourth Amendment rights when he allegedly kicked

2    plaintiff in the face and side.  Defendant's briefing does not discuss whether his show of force

3    with the gun was objectively reasonable, and therefore the Court concludes he has not met his

4    burden of establishing that he is entitled to judgment as a matter of law on this claim.  The Court

5    further concludes that it was clearly established at the time that the alleged kicks to plaintiff's

6    face and side were unconstitutional, and therefore, plaintiff should be permitted to proceed to a

7    jury on these claims.  Finally, even assuming defendant violated plaintiff's constitutional rights

8    when he pointed his gun at plaintiff, the law did not clearly establish that such conduct was

9    unconstitutional under the circumstances of this case.  Accordingly, defendant is entitled to

10   qualified immunity on this claim.  The Court's reasoning is explained below.[12]

11          1.      *Whether defendant violated plaintiff's constitutional rights*

12          As discussed above, the Court must decide whether, viewing the evidence in plaintiff's

13   favor, defendant used an objectively unreasonable degree of force during the arrest.  To answer

14   this question, the Court must balance the nature and quality of the intrusion against the

15   governmental interests in the use of force, including the severity of the crime at issue, whether

16   plaintiff posed an immediate threat to the safety of defendant or others, whether plaintiff was

17   actively resisting arrest or attempting to evade arrest by flight, and any other relevant factors.

18   The Court will consider each factor in turn before engaging in the requisite balancing.

19          a.      *Nature and quality of the intrusion*

20          The Ninth Circuit has noted that when assessing reasonableness, it is important to keep in

21   mind the magnitude of the pain and injuries caused by the use of force.  *Mattos v. Agarano*, 661

22   F.3d 433, 443 (9th Cir. 2011).  Here, the Taser strikes caused a puncture wound on the back of

23
_____

[12] Because the parties did not sufficiently brief the issue, the Court does not provide further discussion of whether
defendant violated plaintiff's constitutional rights by pointing his gun at plaintiff.

1   plaintiff's head and separated part of his ear from his scalp.  Construing the facts most favorably

2   to plaintiff, the two kicks to his face split open his forehead, fractured his nose, split open both of

3   his lips, broke a tooth, and caused him to lose consciousness.  The kicks to the side injured his

4   ribs.

5        The parties agree that defendant used an intermediate or significant level of force when

6   he kicked plaintiff in the side.  (Dkt. 70 at 14; Dkt. 72 at 21-22.)  *See Garlick v. Cnty. of Kern*,

7   167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) ("Generally, impact blows by punching or kicking

8   are considered 'significant force.'") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 480

9   (9th Cir. 2007)).  Intermediate or significant force is "capable of inflicting significant pain and

10   causing serious injury." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) ("while less

11   severe than deadly force, [intermediate force] nonetheless present[s] a significant intrusion upon

12   an individual's liberty interests").

13        Defendant asserts that the Taser strikes to the head and the alleged kicks to the face were

14   also intermediate force.  (Dkt. 70 at 14.)  Plaintiff counters that these uses of force were deadly

15   force or, at a minimum, extremely severe force.[13]  (Dkt. 72 at 21-22.)  Deadly force "creates a

16   substantial risk of causing death or serious bodily injury." *City of Hemet*, 394 F.3d at 706.

17   While the use of deadly force must be analyzed under the objective reasonableness test, *Scott*,

18   550 U.S. at 382, the general rule is that deadly force is reasonable only "if the suspect threatens

19   the officer with a weapon or there is probable cause to believe that he has committed a crime

20

21

22

23

---

[13] Plaintiff also contends that defendant's repeated applications of intermediate force amounted to deadly force, citing *Jones v. Las Vegas Metropolitan Police Department*, 873 F.3d 1123 (9th Cir. 2017).  (Dkt. 72 at 21.)  *Jones* is readily distinguishable.  In *Jones*, multiple officers repeatedly and simultaneously used their Tasers on the suspect, who was not resisting, for over 90 seconds, causing his death.  *Id.* at 1131.  The officers had been instructed that repeated Taser applications could contribute to serious injury or death, particularly when the target was subject to certain risk factors that officers knew were present at the time.  *Id.*  Thus, the court determined that a reasonable jury could conclude that the officers knew or should have known that their Taser use created a substantial risk of serious injury or death.  *Id.*  The alleged use of force in this case does not amount to the repeated and simultaneous use of the Tasers by multiple officers in *Jones*.

involving the infliction or threatened infliction of serious physical harm," *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 11). "Extremely severe" force is less than deadly force. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055-56 (9th Cir. 2007). However, non-lethal force "that may lead to serious injury may be used only when a strong governmental interest warrants its use . . . ." *Delore v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001).

The Court concludes, as discussed below, that defendant's alleged uses of force fall somewhere between intermediate and extremely severe use of force, but do not rise to the level of deadly force.

i.    *Taser strikes to the head*

Defendant cites the Ninth Circuit's decision in *Young* to support his claim that the Taser strikes to the head were intermediate force. (Dkt. 70 at 14.) In *Young*, the Ninth Circuit held that the officer used intermediate force when he struck the plaintiff in the shin with his baton and attempted but failed to strike the plaintiff in the head with a baton. 655 F.3d at 1161. According to defendant, *Young* establishes that baton strikes to the head are intermediate force. (Dkt. 77 at 9 n.2.)

Plaintiff responds that defendant used the Taser as an "impact weapon," and that under Snohomish County Sheriff's Office's ("SCSO") guidelines, strikes to the head with an impact weapon are a Level III use of force.[14] (Dkt. 72 at 19, 19 n.10, 21, 21 n.12.) Plaintiff points out that SCSO training materials define an impact weapon as "any object you deploy that uses blunt force, generated through muscular power, to control the Threat or defend yourself or another,"

---

[14] SCSO's Use of Force Manual defines Level III use of force as "Tertiary targets including head and neck with impact weapon, firearms or any other tool or action likely to cause death." (Dkt. 73 at 179.) Although the manual does not expressly equate Level III with deadly force, it is the highest level of force defined in the manual. (*See id.*)

1  which plaintiff contends includes a Taser.  (Dkt. 73 at 191.)  Plaintiff notes that defendant

2  himself identified his Taser as an impact weapon in his Use of Force report (Dkt. 73 at 111), and

3  plaintiff's use of force expert, Scott DeFoe, testified that a Taser could be used as an impact

4  weapon (Dkt. 73 at 107-08).  Plaintiff also cites Dr. Gustin's opinion that "the head is very

5  vulnerable, and a hit on the back of the head with an object like a taser could potentially fracture

6  the skull, and any fractured skull can potentially lead to an intracranial bleed, which can cause

7  death."  (Dkt. 75 at ¶ 33.)

8          Defendant replies that plaintiff fails to offer evidence supporting the likelihood of death

9  or serious bodily injury from strikes to the head with the Taser, which weighs just over seven

10  ounces or as much as a legal pad of paper.  (Dkt. 77 at 10; Dkt. 73 at 106.)  Defendant points out

11  that the training materials plaintiff cites were created more than two years after the incident and

12  were focused on heavier impact weapons such as batons or metal flashlights.  (Dkt. 77 at 10.)

13  The SCSO officer who provided the training, Deputy B. Scott Wells, testified that a Taser is not

14  an impact weapon and is made of a hard plastic that is known to break when dropped on the

15  ground.  (Dkt. 81 at 23-25.)  Sean Hendrickson, defendant's use of force expert and an instructor

16  with the Washington State Criminal Justice Training Commission, explained that a "strike

17  delivered with a Taser model x26 CEW still in the hand is in no way reasonably comparable to a

18  strike with an impact weapon like an expandable baton, straight stick, or full-sized duty

19  flashlight," which each weigh at least 20 ounces or significantly more.  (Dkt. 80 at ¶ 28.)

20  According to Mr. Hendrickson, a strike with a Taser in hand is not deadly force, even when

21  applied to the head.  (*Id.*)

22          Defendant's argument that *Young* establishes baton strikes to the head as intermediate

23  force is not persuasive.  The Ninth Circuit's opinion makes clear that while the officer "swung

REPORT AND RECOMMENDATION - 29

1   the baton at Young's head multiple times," he never struck the suspect's head and only struck his

2   legs. *Young*, 655 F.3d at 1162. Thus, the court only considered the amount of force caused by

3   the strikes to the legs.

4           Nevertheless, as defendant argues, the evidence in the record does not establish that

5   strikes to the head with a Taser in hand are deadly force. Although the parties debate whether a

6   Taser is an "impact weapon" that could amount to a Level III use of force when used to strike the

7   head, there is no dispute that defendant's Taser weighed approximately seven ounces, while

8   more traditional impact weapons, such as batons, straight sticks, or duty flashlights, weigh over

9   20 ounces. As such, there is a significant difference between being hit in the head with a Taser

10  and being hit with the other weapons. (Dkt. 80 at ¶ 28.)

11          More importantly, however, plaintiff fails to point to any direct evidence in the record

12  that defendant's strikes with the Taser presented a substantial risk of causing death or serious

13  bodily injury. Indeed, Dr. Gustin's testimony belies a finding of substantial risk: "a hit on the

14  back of the head with an object like a taser *could potentially* fracture the skull, and any fractured

15  skull *can potentially* lead to an intracranial bleed, which *can* cause death." (Dkt. 75 at ¶ 33

16  (emphases added).) The potential identified by Dr. Gustin is far less likely than the "substantial

17  risk" required for deadly force. Thus, regardless of whether the strikes to the head with the Taser

18  are classified as intermediate force or something more, they do not rise to the level of deadly

19  force. *See City of Hemet*, 394 F.3d at 702 (declining to find that officers used deadly force but

20  finding that the force was "even greater" than "intermediate" or "severe" force); *Mattos*, 661

21  F.3d at 443 (declining to define precise level of force but still proceeding to determine

22  reasonableness of officer's actions).

23

1

2                          ii.      *Kicks to the head*

3              Defendant relies on *Ames v. King County, Washington*, 846 F.3d 340 (9th Cir. 2017), to

4       argue that the alleged kicks to the head were intermediate or severe force.  (Dkt. 70 at 14.)  In

5       *Ames*, the deputy allegedly slammed the plaintiff's head into the ground during the course of

6       handcuffing her.  846 F.3d at 345.  The court did not label quantum of force used and instead

7       focused on whether the allege force was objectively reasonable given that the plaintiff was

8       interfering with paramedics' attempts to administer emergency medical services.  *See id.* at 348-

9       49.  *Ames* does not establish that kicks to the head are intermediate force.

10             Plaintiff argues that the Ninth Circuit has repeatedly warned that punches, stomps, and

11      other attacks to a person's head can amount to an extreme use of force, or even deadly force.

12      (Dkt. 72 at 21.)  Plaintiff cites two cases that involved attacks to the head, *Davis v. City of Las*

13      *Vegas*, 478 F.3d 1048 (9th Cir. 2007), and *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir.

14      2017), both of which indicate that such attacks are extremely severe but less than deadly force.

15             In *Davis*, the handcuffed suspect refused to consent to being searched by the officer and

16      the officer slammed him head-first into a wall several times, threw him face-down on the floor,

17      pinned him against the floor, and punched him in the face.  478 F.3d at 1051-52.  At some point,

18      the suspect's neck was fractured.  *Id.*  The court determined that the officer's use of force was

19      "extremely severe."  *Id.* at 1055.

20             In *Zion*, the officer shot the suspect nine times, the suspect fell to the ground, the officer

21      fired another nine rounds into the suspect's body at relatively close range, the suspect lay on his

22      side still moving, the officer took a running start and stomped on the suspect's head three times,

23      and the suspect died at the scene.  874 F.3d at 1075.  In discussing whether a reasonable jury

REPORT AND RECOMMENDATION - 31

could find that the officer used excessive force when he fired the second nine rounds and/or

stomped on the suspect's head, the Ninth Circuit did not specifically identify the level of force

associated with the head-stomping.  *Id.* at 1075-76.  The court's discussion of "clearly

established" rights, however, provides additional guidance regarding the head-stomping, albeit

indirectly.  The court explained:

> If a jury determines that Zion no longer posed an immediate threat, any deadly
> force Higgins used after that time violated long-settled Fourth Amendment law.
> We have cases holding that the use of deadly force against a non-threatening
> suspect is unreasonable.  *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S.
> Ct. 1694, 85 L.Ed.2d 1 (1985); *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.
> 1997).  We've also held that continued force against a suspect who has been
> brought to the ground can violate the Fourth Amendment.  In *Drummond v. City
> of Anaheim*, we found that officers used excessive force by sitting on a prone
> suspect's back, asphyxiating him.  343 F.3d 1052, 1057-58 (9th Cir. 2003).  And
> in *Davis v. City of Las Vegas*, we held that an officer violated the Fourth
> Amendment by punching a handcuffed suspect in the face while the suspect lay
> on the floor.  478 F.3d 1048, 1053 (9th Cir. 2007).  If a jury were to find that
> Higgins shot and/or stomped on Zion's head after Zion no longer posed an
> immediate threat, Higgins would have been "on notice that his conduct would be
> clearly unlawful."  *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150
> L.Ed.2d 272 (2001).

*Id.* at 1076.  There is no question that the officer's use of his firearm constituted deadly force,

and both *Garner* and *Harris* involved officers shooting suspects.  But the Ninth Circuit also cited

*Drummond* and *Davis*, both of which involved non-deadly force.  *See Drummond*, 343 F.3d at

1056, 1057 n.7 (concluding that sitting on prone suspect's back while he begged for air was a

"severe" level of force that was, "under the circumstances, capable of causing death or serious

injury," but declining to decide whether it amounted to "deadly force"); *Davis*, 478 F.3d at 1055

(concluding that officer used "extremely severe" force when he slammed the handcuffed suspect

head-first into a wall several times, threw him face-down on the floor, pinned him against the

floor, and punched him in the face).  The Ninth Circuit's reliance on *Drummond* and *Davis*

1    indicates that the head-stomping was an extremely severe, but less than deadly, level of force.

2    Otherwise, the court would have limited its "clearly established" rights discussion to the deadly

3    force cases.

4        Based on *Davis* and *Zion*, the Court concludes that defendant used an extremely severe

5    level of force when he allegedly kicked plaintiff in the face.

6        b.    *Governmental interests*

7        As noted above, the governmental interest is measured by considering the severity of the

8    crime at issue, whether the suspect posed an immediate threat to the safety of the officer or

9    others, whether the suspect was actively resisting arrest or attempting to evade arrest, and any

10   other relevant factors.

11        i.    *Severity of the crime at issue*

12        The first factor to consider is the severity of the crime at issue.  Defendant argues that this

13   factor favors him because plaintiff was a convicted felon with two active felony warrants for

14   burglary and theft.  (Dkt. 70 at 14.)  Defendant also asserts that he had probable cause to arrest

15   plaintiff for multiple counts of identity theft and possession of stolen property, both of which are

16   class C felonies, and an assortment of misdemeanors.  (*Id.* at 14-15.)  Defendant contends that

17   one of plaintiff's warrants had an officer caution, which informed him that a higher level of

18   caution was required.  (*Id.* at 15.)

19        Plaintiff responds that this factor is neutral because the crimes at issue were nonviolent

20   property crimes that would not have suggested to a reasonable officer he could use an extreme

21   amount of force during the arrest.  (Dkt. 72 at 24.)  Plaintiff cites *City of Hemet* for support.  (*Id.*)

22   In *City of Hemet*, police responded to a 911 call alleging domestic abuse.  394 F.3d at 702.  The

23   court noted "the seriousness and reprehensibility of domestic abuse" but concluded that the

1  circumstances of the case—where plaintiff was on the porch alone when police arrived and was

2  not armed—did not "warrant the conclusion that Smith was a particularly dangerous criminal or

3  that his offense was especially egregious." *Id.* at 702-03.  Thus, "the nature of the crime at issue

4  provide[d] little, if any, basis for the officers' use of physical force." *Id.* at 703 (alteration

5  added).

6          There is no dispute that plaintiff had two felony warrants for nonviolent property crimes

7  with an officer caution, and defendant had probable cause to arrest him for other nonviolent

8  felonies and misdemeanors.  "The government has an undeniable, legitimate interest in

9  apprehending criminal suspects . . . and that interest is even stronger when the criminal is . . .

10 suspected of a felony." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003); *see also Coles*

11 *v. Eagle*, 704 F.3d 624, 628-29 (9th Cir. 2012) (noting stolen car was "felony grade offense,"

12 which factored in favor of defendant officers).  The Ninth Circuit, however, has also cautioned

13 that a "wide variety of crimes, many of them nonviolent, are classified as felonies." *Chew v.*

14 *Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994).  In *Chew*, the court found that a suspect wanted for

15 burglary weighed in favor of the government "only slightly." *Id.*  Therefore, the seriousness of

16 plaintiff's suspected crimes, all of which were nonviolent, weighs slightly in favor of defendant.

17                          ii.      *Immediate threat*

18          The "'most important' factor under *Graham* is whether the suspect posed an 'immediate

19 threat to the safety of officers or third parties.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir.

20 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  The immediacy of the

21 "threat analysis must be based on objective factors and not merely 'a simple statement by an

22 officer that he fears for his safety or the safety of others.'" *Nelson v. City of Davis*, 685 F.3d

23 867, 880 (9th Cir. 2012) (quoting *Delore*, 272 F.3d at 1281).  Likewise, the officer's use of force

REPORT AND RECOMMENDATION - 34

1    must be evaluated based on "his contemporaneous knowledge of the facts," and the Court cannot

2    consider evidence of which he was not aware. *Delore*, 272 F.3d at 1281.

3           Defendant maintains that this factor favors him. He asserts that when he initially

4    questioned plaintiff, plaintiff was defensive and used profanities. (Dkt. 70 at 15.) Defendant

5    contends that plaintiff's warrant had officer cautions and his behavior was visibly angry,

6    aggressive, and erratic. (*Id.*) Defendant points out that he was alone with plaintiff, and plaintiff

7    appeared to be 65 pounds heavier than him. (*Id.*) According to defendant, these factors,

8    combined with plaintiff's repeated refusal to obey his orders and submit to handcuffing,

9    plaintiff's active resistance to handcuffing, and plaintiff's bladed stance, establish that plaintiff

10   posed an immediate threat prior to the initial Taser deployment. (*Id.*) Defendant argues that

11   plaintiff's subsequent actions posed an even greater threat to the innocent public because he was

12   running towards the busy interstate, which put himself, defendant, and motorists at risk.[15] (Dkt.

13   70 at 15.) Defendant also asserts that plaintiff tried to get up after being brought to the ground

14   and refused to comply with commands. (Dkt. 77 at 11.)

15          Plaintiff responds that nothing in defendant's police reports would have made a

16   reasonable officer concerned for his own safety. (Dkt. 72 at 23.) Plaintiff points out that

17   defendant knew he was unarmed, the interaction was in the middle of the day and in public, he

18   never tried to assault defendant, and he was only an inch taller than defendant, overweight, and

19   almost 45 years old at the time. (*Id.* at 23-24.) Plaintiff cites testimony from defendant's use of

20   force expert that a height difference of two inches would have been a non-factor in a use of force

21   assessment, and also notes that defendant was in good shape. (*Id.* at 24.) Plaintiff notes his own

22

23   ---

[15] Defendant cites *Scott v. Harris*, 550 U.S. 372 (2007), and *Ames v. King County*, 846 F.3d 430 (9th Cir. 2017), in support of this argument. These cases are readily distinguishable. *Scott* involved a high speed car chase. *Ames* involved a witness who was preventing paramedics from responding to a medical emergency. In contrast, this case involved a man running (allegedly not quickly) in the direction of a freeway that was approximately 50 yards away.

REPORT AND RECOMMENDATION - 35

1    testimony, which must be credited on summary judgment, that he did not "snarl" at defendant,

2    stand in an aggressive or threatening manner, or verbally or physically threaten defendant.  (*Id.*)

3    Plaintiff contends that any immediate public safety risk would have been gone as soon as he was

4    flat on the ground after the second tasing.  (Dkt. 72 at 23 (citing testimony from defendant's use

5    of force expert that "immediate" threat is one that is "occurring right now" and "there's no buffer

6    of time" (Dkt. 73 at 144-45), and that "the immediacy of the threat was gone as soon as

7    [plaintiff] hit the ground" (*id.* at 157)).)[16]  Plaintiff also notes that he did not try to get up after

8    defendant jumped on his back.  (Dkt. 72 at 24.)

9            While the totality of the circumstances must be taken into account, the key question is

10   whether plaintiff posed an immediate threat at the time of the allegedly excessive uses of force,

11   namely the strikes to the back of his head with the Taser, the alleged kicks to his face, and the

12   kicks to his side.  Before defendant used this force, plaintiff had resisted being handcuffed,

13   defeated one tasing, and fled on foot.  Defendant was the only officer at the scene, and he did not

14   know how long until backup would arrive.  Plaintiff was unarmed but significantly heavier than

15   defendant.  After defendant brought plaintiff to the ground with the second tasing and a kick to

16   the back, plaintiff started to push himself up.  Defendant then jumped on his back and hit him

17   two or three times with the Taser in hand.  At the time defendant hit plaintiff with the Taser, a

18   reasonable officer on the scene would have considered plaintiff an immediate threat because

19   plaintiff was continuing to resist defendant's attempts to stop his flight.  The immediate threat

20   factor weighs in defendant's favor with respect to the strikes with the Taser.

21           After the strikes with the Taser, however, plaintiff's testimony—which must be credited

22   on summary judgment—is that he did not try to get up.  Although he failed to comply with

23

---

[16] As defendant points out, his use of force expert's full testimony was that "the immediacy of the threat was gone as soon as he hit the ground.  But it doesn't end the threat."  (Dkt. 73 at 157.)

REPORT AND RECOMMENDATION - 36

1    defendant's order to put his hands behind his back, he did not make any move to flee or fight;

2    instead, he reached his hand up to wipe blood out of his eyes.  In addition, defendant had stood

3    up and therefore there was some distance between himself and plaintiff.  Defendant also had his

4    Taser in hand and the barbs were still attached to plaintiff.  (*See* Dkt. 73 at 88.)  In this situation,

5    a reasonable officer would not have perceived plaintiff to be an immediate threat.  *See Zion*, 874

6    F.3d at 1076 (once suspect was lying on the ground, he "was not in a position where he could

7    easily harm anyone or flee" and a reasonable jury could find he was "no longer an immediate

8    threat" and the officer should have held his fire unless and until the suspect showed signs of

9    danger or flight).  Defendant nevertheless allegedly kicked plaintiff twice in the face, knocking

10   him unconscious, and then continued to kick him in the side.  During this use of force, the

11   immediate threat factor weighs in plaintiff's favor.

12                  iii.    *Actively resisting arrest or attempting to evade arrest by flight*

13          The third *Graham* factor is whether the suspect was actively resisting arrest or attempting

14   to evade arrest by flight.  Defendant argues that this factor weighs in his favor because plaintiff

15   ignored his commands to submit to handcuffing, resisted his handcuffing attempts, made an

16   aggressive movement toward him, defeated his first Taser deployment, ran towards a busy

17   interstate, and continued resisting arrest and ignoring commands until backup arrive, despite

18   multiple Taser activations, two compliance strikes, and at least two foot strikes.  (Dkt. 70 at 16.)

19          Plaintiff concedes that this factor "cuts slightly" in defendant's favor, but he maintains

20   that it does not justify the amount of physical force used given that there was no threat to officer

21   or public safety.  (Dkt. 72 at 24.)  Plaintiff admits that he was initially trying to evade arrest by

22   running away, but he maintains that the risk of escape ended after the second tasing.  (*Id.*)

23   According to plaintiff, at that point, he was on the ground and had Taser probes attached to his

1    body, defendant knew backup was on the way, and defendant knew he could activate the Taser

2    again if necessary.  (*Id.* at 25.)  Plaintiff asserts that defendant had regained control of the

3    situation and had no need to use additional force.  (*Id.*)

4         There is no dispute that plaintiff resisted defendant's attempts to handcuff him and tried

5    to evade arrest by running away.  But in arguing that the risk of his escape ended after the second

6    tasing, plaintiff ignores his own statement in his verified amended complaint that he started to

7    push himself up after defendant kicked him to the ground.  As discussed previously, *see supra*

8    pg. 15, this statement must be credited here.  Thus, even viewing the evidence in plaintiff's

9    favor, a reasonable officer would have understood that plaintiff was continuing to attempt to flee

10   at the time defendant jumped on his back and hit him with the Taser.  After this point, however, a

11   reasonable officer would have perceived that plaintiff stopped trying to flee and was no longer

12   actively resisting arrest.  Accordingly, this factor weighs in defendant's favor until after the

13   Taser strikes to plaintiff's head, and then the factor favors plaintiff.

iv.    *Balancing the Graham factors*

15        Having assessed the type and amount of force inflicted, as well as the governmental

16   interests favoring the use of force, the Court must balance those factors to determine whether

17   defendant's use of force was objectively reasonable under the totality of the circumstances.  "The

18   'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

19   officer on the scene, rather than with the 20/20 vision of hindsight," and "the calculus of

20   reasonableness must embody allowance for the fact that police officers are often forced to make

21   split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving—

22   about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-

23   97.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

1   chambers, violates the Fourth Amendment." *Id.* at 396 (quotation omitted).  Furthermore, as a

2   situation evolves, the justification for the use of force may change.  *Jones*, 873 F.3d at 1130 ("As

3   the situation evolved . . . the justification for the use of force waned."); *Cyrus v. Town of

4   Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("as the threat changes, so too should the degree

5   of force") (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

6           As discussed above, the Taser strikes to the head amounted to an intermediate or severe

7   level of force.  Viewing the evidence in plaintiff's favor but from the perspective of a reasonable

8   officer on the scene, this level of force was objectively reasonable under the circumstances.

9   Plaintiff was wanted for nonviolent felonies and misdemeanors.  Defendant was the only officer

10  at the scene, and he did not know when backup would arrive.  Although defendant was strong

11  and physically fit, plaintiff significantly outweighed him.  Moments before the Taser strikes to

12  his head, plaintiff had defeated the Taser and fled on foot, and defendant had used reasonable

13  force to stop him by deploying his Taser a second time.  Plaintiff fell to his knees and defendant

14  brought him to the ground with a kick to the back.  Plaintiff, however, did not stay down; he

15  started to push himself up, thus suggesting to a reasonable officer that he intended to continue to

16  flee or otherwise actively resist arrest.  In response, defendant jumped on his back and struck him

17  with the Taser two or three times.  The scene was rapidly evolving, and without the 20/20 vision

18  of hindsight, defendant's split-second judgments were reasonable.

19          The same is not true for the alleged kicks to plaintiff's face and side.  As discussed above

20  and construing the facts in plaintiff's favor, defendant used an extremely severe level of force

21  when he allegedly kicked plaintiff's face and a significant level of force when he kicked

22  plaintiff's side.  Viewing the evidence in the light most favorable to plaintiff and from the

23  perspective of a reasonable officer at the scene, this very significant intrusion upon plaintiff's

1  liberty interests was not reasonable under the circumstances.  When the first alleged kick

2  happened, plaintiff was lying face down on the ground and did not present any immediate threat.

3  Although he did not immediately comply with defendant's verbal commands to put his hands

4  behind his back, he did not attempt to flee or fight.  In this situation, it was objectively

5  unreasonable for defendant to kick him twice in the face, blows that were strong enough to cause

6  significant injuries and render plaintiff unconscious, and then continue to kick him in the side.

7       In sum, defendant's motion for summary judgment should be granted with respect to

8  plaintiff's excessive force claim based on defendant hitting him with the Taser because this use

9  of force was objectively reasonable given the circumstances.[17]  Under plaintiff's version of the

10  facts, however, defendant's alleged kicks were excessive.  Accordingly, the Court must consider

11  whether defendant is entitled to qualified immunity on these claims.

12       2.    *Whether defendant is entitled to qualified immunity*

13       Because defendant has not shown that he used reasonable force, as a matter of law, when

14  he allegedly kicked plaintiff in the face and side and pointed his gun at plaintiff, the Court must

15  ask whether the right to be free from such excessive force was clearly established.  *Saucier*, 533

16  U.S. at 201.  As noted previously, the Court must determine whether it would be clear to a

17  reasonable officer that his conduct was unlawful in the situation he confronted.  *Id.* at 202.

18  "[R]easonableness is judged against the backdrop of the law at the time of the conduct," and

19  although the law "does not require a case directly on point," "existing precedent must have

20  placed the statutory or constitutional question beyond debate."  *Kisela*, 138 S. Ct. at 1152

21  (quoted sources omitted, alteration added).  If a right is clearly established by decisional

22

23  [17] Even if defendant violated plaintiff's constitutional rights by striking him with the Taser, defendant would be entitled to qualified immunity on this claim because plaintiff has not pointed to law clearly establishing that an officer could not use a significant level of force to stop a fleeing suspect wanted for a nonviolent felony who was trying to get up after being brought to the ground.

1   authority of the Supreme Court or the Ninth Circuit, then the Court need inquire no further.

2   *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004).  When there are few binding cases on

3   point, however, the Court looks to non-binding caselaw to determine whether the right is clearly

4   established, including "decisions of state courts, other circuits, and district courts."  *Perez v. City*

5   *of Roseville*, 882 F.3d 843, 857 n.9 (9th Cir. 2018) (quoting *Tekle v. United States*, 511 F.3d 839,

6   847 (9th Cir. 2007)).  As noted, it is plaintiff's burden to establish that the law was clearly

7   established at the time of the incident in July 2014.  *Greene*, 588 F.3d at 1031.

8                    a.      *Alleged kicks to plaintiff's face and side*

9            Defendant argues that even if he used an unconstitutional amount of force, he is entitled

10  to qualified immunity because "[t]here is no clearly established law that would put every police

11  officer on notice that a resisting and fleeing felon who poses an immediate threat to the public

12  cannot be subdued using a Taser, strikes, or kicks."  (Dkt. 70 at 17.)  According to defendant,

13  there were three reported Ninth Circuit cases regarding the use of a Taser at the time of the

14  incident.  (*Id.* at 18-19.)  Plaintiff does not challenge defendant's use of the Taser, and therefore

15  the Taser caselaw is inapplicable.  With respect to the strikes to plaintiff's head and the kicks,

16  defendant contends that there is no Supreme Court or Ninth Circuit opinion that indicates such

17  force would be unconstitutional.  (*Id.* at 19-20.)

18           Plaintiff argues that it has been clearly established for decades that an officer cannot use

19  force on a suspect who has been subdued or rendered helpless.  (Dkt. 72 at 25-26 (collecting

20  cases).)  Indeed, the Ninth Circuit has held, "The use of force against a person who is helpless or

21  has been subdued is constitutionally prohibited."[18]  *Motley v. Parks*, 432 F.3d 1072, 1088 (9th

22

23  [18] Other circuits have reached this same conclusion.  *E.g.*, *Giles v. Kearney*, 571 F.3d 318, 327 (3d Cir. 2009) ("No
reasonable officer could agree that striking and kicking a subdued, nonresisting inmate in the side, with force
enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."); *Morrison v.*

1    Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012);

2    *see also White v. Pauly*, 137 S. Ct. 538, 552 (2017) (per curiam) ("general statements of the law

3    are not inherently incapable of giving fair and clear warning to officers"). By July 2014, the

4    court had applied this rule in a variety of factual situations. *See*, *e.g.*, *Motley*, 432 F.3d at 1089

5    (holding that officer used excessive force when he held infant at gunpoint); *Blackenhorn v. City*

6    *of Orange*, 485 F.3d 463, 478, 480-81 (9th Cir. 2007) (denying qualified immunity to officer

7    who allegedly punched suspect in the face after plaintiff was on the ground, surrounded by

8    officers, and no longer resisting); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-58 (9th

9    Cir. 2003) (holding that officers' alleged act of prolonged pressure onto detainee's prone body as

10   he lay on the ground handcuffed and gasping for air constituted excessive force); *Headwaters*

11   *Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (holding that repeated use

12   of pepper spray against nonviolent protestors under police control rose to the level of excessive

13   force); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding that use of

14   pepper spray after "an arrestee surrenders and is rendered helpless" is obviously excessive

15   force); *Watkins v. City of Oakland*, 145 F.3d 1087, 1090 (9th Cir. 1998) (holding that defendant

16   was "obviously helpless" before he was handcuffed such that continued encouragement of canine

17   attack constituted excessive force); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)

18   (holding that "no particularized case law is necessary for a deputy to know that excessive force

19   has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered

20   and is completely under control" and that this "analysis applies to any arrest situation where

21   force is used"). In light of this authority, the Court concludes that it was clearly established by

22

23

---

*Bd. of Trustees of Green Twp.*, 583 F.3d 394, 408 (6th Cir. 2009) (holding that it was clearly established that "an
officer may not use additional gratuitous force once a suspect has been neutralized").

REPORT AND RECOMMENDATION - 42

1  July 2014 that an officer may not use force against a suspect who has been subdued or is

2  helpless.

3          Viewing the evidence in plaintiff's favor, a reasonable jury could conclude that plaintiff

4  was subdued before defendant allegedly kicked him in the face.  Plaintiff was lying face down on

5  the ground.  He was not trying to get up.  He did not make any aggressive movements toward

6  defendant.  His only movement was to wipe blood from his eyes.  He was not resisting in any

7  way.  Defendant had control of the Taser and the barbs were still attached to plaintiff.  No

8  reasonable officer would have believed that he could use an extremely severe amount of force on

9  such a suspect.  *See, e.g.*, *Blackenhorn*, 485 F.3d at 478, 480-81 (holding that it was

10  unconstitutional for officer to punch suspect in the face and body when suspect was lying on the

11  ground and not resisting).  Defendant is not entitled to qualified immunity on this claim.

12          The same is true for plaintiff's claim based on defendant kicking him in the side.

13  Plaintiff has presented evidence, which must be credited on summary judgment, that the second

14  kick to his face knocked him unconscious and that he was unconscious when defendant kicked

15  him in the side.  No reasonable officer could have believed it was constitutionally permissible to

16  kick an unconscious suspect.  *See id.*; *Drummond*, 343 F.3d at 1062 ("Some police conduct so

17  obviously violates a person's constitutional rights that 'no federal case directly on point' is

18  necessary to put a reasonable officer on notice of its unconstitutional nature.").  Accordingly,

19  defendant should not be protected by qualified immunity for kicking plaintiff in the side while he

20  was allegedly unconscious.

21          Defendant's motion for summary judgment should be denied with respect to both alleged

22  kicks.

23

REPORT AND RECOMMENDATION - 43

1      3.      *Pointing the gun at plaintiff*

2          Defendant does not address whether he is entitled to qualified immunity on plaintiff's

3      claim that he used excessive force when he pointed his gun at plaintiff.  Plaintiff argues that it

4      has been clearly established since at least 2002 that an officer violates the Fourth Amendment

5      when he points a gun at an apparently unarmed suspect during an arrest or detention, especially

6      where the suspect poses no particular danger.  (Dkt. 72 at 26 (citing *Robinson v. Solano Cnty.*,

7      278 F.3d 1007 (9th Cir. 2002) (en banc).)

8          In *Robinson*, officers responded to a radio dispatch regarding a man "carrying a shotgun,"

9      who had just shot two dogs and who was in the street "yelling at this time."  278 F.3d at 1010.

10     After six police vehicles arrived on the scene in broad daylight, the suspect voluntarily

11     approached from his yard in an unbuttoned shirt and jeans.  *Id.* at 1010.  The officers saw that he

12     was no longer carrying the shotgun.  *Id.* at 1010, 1014.  Nevertheless, two of them drew their

13     guns, aiming at the suspect's head.  *Id.* at 1010.  The suspect put his hands up, and one officer

14     stepped forward, thrusting his gun three or four feet from the suspect's head.  *Id.*  The officers

15     handcuffed the suspect and then detained him for approximately 15-30 minutes in their squad car

16     before releasing him without charges.  *Id.*  The Ninth Circuit held that the suspect adequately

17     alleged a violation of his Fourth Amendment rights.  *Id.* at 1015.  The court agreed with the

18     proposition that "[a] police officer who terrorizes a civilian by brandishing a cocked gun in front

19     of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks

20     for a section 1983 claim against him."  *Id.* at 1015 (quoting *Petta v. Rivera*, 143 F.3d 895, 905

21     5th Cir. 1998)) (alteration and emphasis in original).

22         A key difference between *Robinson* and the instant case is that defendant was the only

23     officer at the scene when he pointed his gun at plaintiff.  The published Ninth Circuit cases

1  addressing the issue after *Robinson* but before July 2014 all involved multiple officers.  *Motley*,

2  432 F.3d at 1076; *Tekle v. United States*, 511 F.3d 839, 845-46 (9th Cir. 2007); *Hopkins v.*

3  *Bonvicino*, 573 F.3d 752, 776-77 (9th Cir. 2009); *Espinosa v. City & Cnty. of San Francisco*, 598

4  F.3d 528, 537-38 (9th Cir. 2010); *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1050

5  (9th Cir. 2014); *Sandoval v. Las Vegas Metro. Police Dept.*, 756 F.3d 1154, 1165 (9th Cir.

6  2014).  Plaintiff has not identified any case where the court held that a lone officer could not

7  level his gun at a suspect, particularly one who had resisted arrest and attempted to flee, while

8  waiting for backup to arrive.

9         Another difference is that plaintiff claims he was unconscious when defendant drew the

10  gun, and therefore he does not identify any harm from defendant's show of force.  The caselaw,

11  by contrast, involves officers whose actions terrorized the plaintiffs.  *E.g.*, *Robinson*, 432 F.3d at

12  1010 (plaintiff's testimony that he feared for his life when the officer pointed the gun at him).

13  For these reasons, the Court concludes that defendant is entitled to qualified immunity on this

14  claim.

15                    V.        CONCLUSION

16         The Court recommends that defendant's motion for summary judgment (Dkt. 70) be

17  GRANTED in part and DENIED in part.  Defendant is entitled to summary judgment on

18  plaintiff's claim based on the strikes with the Taser because defendant did not use

19  constitutionally excessive force.  Defendant is entitled to summary judgment on plaintiff's claim

20  based pointing the gun at him because defendant is shielded by qualified immunity.  Defendant is

21  not entitled to summary judgment on plaintiff's claims based on kicking him in the face and side.

22         The Court also recommends that defendant's motion to strike under the sham affidavit

23  rule (Dkt. 77) be GRANTED in part and DENIED in part.  The motion should be granted with

respect to paragraph 18 of Docket 74, which should be STRICKEN, and denied in all other respects.

A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 15, 2018**.

Dated this 25th day of May, 2018.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 46