1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
7                                         AT SEATTLE

8    ROBERT JOHN PRESTON,

9                            Plaintiff,              Case No. C16-1106-JCC-MAT

10         v.                                        REPORT AND RECOMMENDATION

11   RYAN BOYER, et al.,                                    **REDACTED**[1]

12                           Defendants.

13

14                              I.        INTRODUCTION

15         In this 42 U.S.C. § 1983 action, plaintiff Robert Preston alleges that defendant Ryan Boyer,

16   now a Sergeant with the Snohomish County Sheriff's Office ("SCSO")[2], used excessive force

17   against him in July 2014 and that Snohomish County was negligent in hiring and retaining Sgt.

18   Boyer.  Currently before the Court is the County's motion for summary judgement on the negligent

19

20

---

[1] The Court will file both unredacted sealed and redacted unsealed versions of this Report and Recommendation. Sealing and redacting are necessary to avoid disclosure of highly personal information relating to defendant Ryan Boyer.

[2] Sgt. Boyer was a deputy at the time of the incident and an officer prior to joining the SCSO.  For consistency, the Court will refer to him as Sgt. Boyer throughout this Report and Recommendation.

REPORT AND RECOMMENDATION - 1

1   hiring and retention claims against it. (Dkts. 159 (redacted), 160 (sealed).)[3]  Plaintiff opposes the

2   motion. (Dkts. 184 (redacted), 187 (sealed).)[4]  In reply, the County moved to strike the report of

3   plaintiff's expert, Scott DeFoe (Dkt. 191), which the Court has already denied (Dkt. 204).  The

4   parties also filed motions to seal (Dkts. 158, 183), which the Court grants in part and denies in part

5   as explained herein.

6         Having considered the parties' submissions regarding the motion for summary judgment,

7   the oral argument of counsel on November 21, 2019, the balance of the record, and the governing

8   law, the Court recommends that the County's motion for summary judgment be DENIED.

9                                    II.        BACKGROUND[5]

10  A.        Interlocal Agreement Between the City of Snohomish and Snohomish County

11        In June 2007, the City of Snohomish hired Sgt. Boyer as a police officer.  (Dkt. 166

12  ("Johnson Decl.") at ¶ 5.)  In 2011, the City entered into an Interlocal Agreement ("Interlocal")

13  with the County, whereby the City's police force would be disbanded and the SCSO would assume

14  law enforcement duties beginning on January 1, 2012.  (See Dkt. 166-5; Johnson Decl. at ¶ 5.)

15  Pursuant to the Interlocal, City police officers were eligible for transfer to the SCSO as provided

16  in RCW 41.14.250, 260, and 270. (Dkt. 166-5 at 10.) These "transfer statutes were enacted to

17  give special protection and privileges within the county civil service system to city law

18  enforcement employees who lose their jobs when the City contracts to have law enforcement

19

---

20  [3] The County filed a redacted unsealed version of its motion (Dkt. 159), as well as an unredacted sealed version (Dkt. 160).  All subsequent references will be to the unredacted sealed version, although page numbers are the same for

21  both.

    [4] As with the County's motion for summary judgment, the Court will cite to plaintiff's unredacted sealed opposition

22  to the County's motion.

23  [5] Additional background facts and procedural history are available at Docket Numbers 42, 88, 113, and 152, and will not be repeated here.

**REDACTED** - 2

1    services provided by the County." *Stone v. Chelan Cnty. Sheriff's Dep't*, 110 Wash.2d 806, 809

2    (1988). The statutes, however, do not establish an unconditional right to transfer employment. *Id.*

3    at 810. Rather, city police department employees are only eligible for transfer if they meet certain

4    requirements, including "the minimum standards and qualifications of the county sheriff's office."

5    RCW 41.14.250.[6] Among other requirements, SCOS's minimum qualifications require applicants

6    to pass a civil service examination, a complete background investigation, fingerprinting, a criminal

7    record check, a polygraph examination, a medical examination, and a psychological evaluation.

8    (Dkt. 166-4 at 3.) Once an employee is deemed eligible under RCW 41.14.250, "transfer of

9    employment shall be made." RCW 41.14.260(a).[7]

10

11

12   [6] RCW 14.41.250 states:

13          When any city or town shall contract with the county sheriff's office to obtain law enforcement
            services to the city or town, any employee of the police department of such city or town who (1)
14          was at the time such contract was entered into employed exclusively or principally in performing
            the powers, duties, and functions which are to be performed by the county sheriff's office under
15          such contract (2) will, as a direct consequence of such contract, be separated from the employ of the
            city or town, and (3) meets the minimum standards and qualifications of the county sheriff's office,
16          then such employee may transfer his or her employment to the county sheriff's office as provided
            for in RCW 41.14.260 and 41.14.270.

17   [7] RCW 14.41.260(a) states:

18          (1) An eligible employee may transfer into the county civil service system for the sheriff's office by
            filing a written request with the county civil service commission and by giving written notice thereof
19          to the legislative authority of the city or town. Upon receipt of such request by the civil service
            commission the transfer of employment shall be made. The employee so transferring will (1) be on
20          probation for the same period as are new employees of the sheriff's office, (2) be eligible for
            promotion after completion of the probationary period is completed, (3) receive a salary at least
21          equal to that of other new employees of the sheriff's office, and (4) in all other matters, such as
            retirement, vacation, etc., have, within the county civil service system, all the rights, benefits, and
22          privileges that he or she would have been entitled to had he or she been a member of the county
            sheriff's office from the beginning of his or her employment with the city or town police department.
            The city or town shall, upon receipt of such notice, transmit to the county civil service commission
23          a record of the employee's service with the city or town which shall be credited to such member as
            a part of his or her period of employment in the county sheriff's office. The sheriff may appoint the
            transferring employee to whatever duties he or she feels are in the best interest of the department
            and the individual.

**REDACTED** - 3

B.    Sgt. Boyer's SCSO Application

        In November 2011, Sgt. Boyer submitted his application package to transfer to the SCSO. (Johnson Decl. at ¶ 6.)  The application included a background history packet, which required Sgt. Boyer to disclose extensive information regarding his employment history, drug use, arrests, and other potentially relevant information.  (Dkt. 167 at 36-71.)  Sgt. Boyer disclosed the following. He was born in 1980.  (*Id.* at 36.)  He was in the Navy from March 2000 until December 2003 and was honorably discharged.  (*Id.* at 40, 73.)  Before enlisting in the Navy, he ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  While in the Navy, he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In 2005

and 2006 he received two speeding tickets.  (*Id.* at 58.)  Sgt. Boyer also disclosed ▮▮▮▮▮▮

1

2

3     After receiving his application, Lieutenant Susanna Johnson[8] met with Sgt. Boyer to

4 explain the application process, go through his application, and determine if there were any

5 automatic disqualifiers.[9] (*Id.* at ¶ 4.) Lt. Johnson found no automatic disqualifiers and took Sgt.

6 Boyer for fingerprinting and a criminal history check. (*Id.*) She also facilitated scheduling his

7 polygraph and psychological evaluation. (*Id.*) After the meeting, she sent Sgt. Boyer's application

8 package to the background investigator, Deputy Jared Reid. (*Id.*)

9 C.     Deputy Reid's Background Investigation

10     On November 18, 2011, Deputy Reid received Sgt. Boyer's application package and began

11 to review the application and obtain additional information. (Dkt. 163 ("Reid Decl.") at ¶¶ 5-6;

12 *see also* Dkt. 163-1.) He sent out an email seeking input from County employees about Sgt. Boyer

13 and received numerous positive emails and comments from various deputies and no negative

14 emails. (Reid Decl. at ¶ 6; *see also* Dkt. 163-2; Dkt. 167 at 74-121.) He attempted to contact Sgt.

15 Boyer's personal and professional references, and those he reached gave positive reviews,

16 including Sgt. Boyer's supervisor at the City police department. (Reid Decl. at ¶ 6; *see also* Dkt.

17 165.) Deputy Reid reviewed Sgt. Boyer's credit and financial history, criminal history, police

18 reports of prior incidents, education documents, and military documents. (*Id.* at ¶ 7.) Deputy Reid

19 spoke with Sgt. Boyer and his wife on several occasions to gather information, clarify information

20 given, answer questions from Sgt. Boyer, or review areas of concern. (*Id.* at ¶ 8.)

21

22 [8] Lt. Johnson is now Chief Johnson, but to avoid confusion the Court will refer to her as Lt. Johnson.

23 [9] SCSO's automatic disqualifiers include a felony conviction, misdemeanor conviction for moral turpitude, conviction for domestic violence or order violation, knowingly falsifying application or personal history packet, illegal drug use within the last five years, illegal use of certain drugs within the last ten years, manufacturing or cultivating illegal drugs for profit, or selling drugs for profit on two or more occasions. (Dkt. 166-6.)

1    Deputy Reid obtained additional information regarding Sgt. Boyer's criminal history (Dkt.

2    167 at 142-196) and confirmed that he had no criminal incidents after 2002 (Dkt. 163 at ¶ 14).  As

3    a part of his investigation, Deputy Reid ████████████████████████████████████

4    ███████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████

12   ███

13   Deputy Reid also went to the City of Snohomish Police Department to review Sgt. Boyer's

14   personnel file and his application package to the City, going page-by-page through the documents.

15   (Reid Decl. at ¶ 9; *see also* Dkt. 164; Dkt. 188 at 1-107.)  Sgt. Boyer's application disclosed ███

16   ███████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████████████

20   ██████████████████████████████████  The City's records also included the Arlington

21   Police reports regarding Sgt. Boyer's February 15, 2002 arrest for assault in the 4th degree, a gross

22   misdemeanor.  (*Id.* at 50-64; Reid Decl. at ¶ 13; *see also* Dkt. 188 at 188 (testimony of Lt. Johnson

23   that 4th degree assault is a gross misdemeanor).)  According to the police reports, Sgt. Boyer was

**REDACTED** - 6

1   involved in a fight outside a bar that a friend of his started. (Dkt. 188 at 57.) One witness saw

2   Sgt. Boyer kick the victim once in the face and once in another area, and another witness saw Sgt.

3   Boyer kick the victim but did not specify where the kick landed. (*Id.*) Sgt. Boyer plead guilty and

4   was sentenced to 12 months probation. (*Id.* at 64, 81.) After he successfully completed probation,

5   the charges were dismissed. (*Id.* at 64.) Finally, the City's personnel file included Sgt. Boyer's

6   psychological evaluation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and his polygraph, which he passed (*id.* at 77-107).

8        In a memo Deputy Reid drafted after reviewing the City's file, the deputy noted two citizen

9   complaints filed against Sgt. Boyer, which were deemed unfounded, and several citizen and

10  departmental commendations. (Dkt. 164 at 2.) He also recorded the successful polygraph

11  examination and the psychological evaluation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He also observed that "it appeared there

15  were no discrepancies" between the information Sgt. Boyer provided to the City and the SCSO.

16  (*Id.* at 3.) Finally, he stated that non-commissioned personnel at the City spoke highly of Sgt.

17  Boyer. (*Id.*)

18       On December 15, 2011, Deputy Reid drafted a background investigation summary and

19  recommendation. (Dkt. 163-5.)[10] On the first page, Deputy Reid checked a box giving Sgt. Boyer

20  a B and recommending he be hired. (*Id.* at 2 ("B: Recommended: This applicant has minor issues

21  and would likely do a good job.").) In the narrative portion of the report, he gave Sgt. Boyer an

22  A-/B+ rating and noted areas of concern as "age/life experience." (*Id.* at 4.) Deputy Reid noted

23

---

[10] The County did not move to seal this exhibit.

1   the numerous positive comments he received regarding Sgt. Boyer and Sgt. Boyer's openness

2   during the investigation, concluding that it appeared Sgt. Boyer had "used his mistakes and learned

3   from them" and "made it a point to not commit the same mistakes again." (*Id.*)   Deputy Reid

4   highlighted Sgt. Boyer's "prior drug use (predominately Marijuana) and his solicitation of a

5   prostitute during his U.S. Naval career." (*Id.*)  Deputy Reid noted that after investigating these

6   areas of concern, it became clear Sgt. Boyer was not proud of his actions, admitted his mistakes,

7   and had not participated in any such activities since at least 2005.  (*Id.*)  Deputy Reid also noted

8   concerns raised in Sgt. Boyer's psychological evaluation, which Deputy Reid attributed to lack of

9   life experience, and stated that Sgt. Boyer currently was older and time had passed since his prior

10  actions. (*Id.*)  Deputy Reid ultimately concluded that Sgt. Boyer would make a positive addition

11  to the SCSO staff.  (*Id.*)

12       Deputy Reid turned in his background investigation report and materials to Sgt. Anthony

13  Aston, whose job it was to review the investigation for completeness. (*See* Dkt. 188 at 194, 196.)

14  Sgt. Aston then gave the materials to Lt. Johnson. (*See id.*)

15  D.   SCSO's Decision to Hire Sgt. Boyer

16       On December 20, 2011, Lt. Johnson reviewed Sgt. Boyer's completed application

17  package.[11] (Johnson Decl. ¶ 7; *see also* Dkt. 188 at 196.)  In addition to passing the background

18  investigation, Sgt. Boyer passed his medical examination, polygraph, and psychological

19  evaluation. (Johnson Decl. ¶ 7.)  The results of these examinations and evaluations became a part

20  of the application package.  (*Id.*)  Lt. Johnson drafted a memorandum to Chief Jeffrey Miller

21  recommending that SCSO hire Sgt. Boyer:

---

[11] It is unclear from the record whether the completed application package included the Arlington Police Report. (*See* Dkt. 188 at 227-29.)  Because the Court must view the evidence in the light most favorable to plaintiff, the Court assumes for purposes of this Report and Recommendation that the Arlington Police Report was not included in the completed application package.

1

2



3

4

5

6

7

8

9

10

11

12

13

(Dkt. 167 at 2.)  Lt. Johnson then gave her memorandum and the completed application package

to Chief Miller.  (Johnson Decl. at ¶ 3; Dkt. 188 at 196.)

On December 21, 2011, Chief Miller drafted a short memorandum to Undersheriff Davis

that stated:



18

19

20

21

22

23

---

[12] The three pages Lt. Johnson flagged related to Sgt. Boyer's criminal history and drug and alcohol use.  (*See* Dkt. 167 at 50, 55, 56.)

1    (Dkt. 167 at 6.)  Undersheriff Davis then received Chief Miller's memorandum, Lt. Johnson's

2    memorandum, and the final application package for review.  (*See* Johnson Decl. at ¶ 8.)

3    Undersheriff Davis wrote on Chief Miller's memorandum, "12-21-11 Reviewed; authorized to

4    hire," and then signed his name.[13]  (Dkt. 167 at 6.)  That same day, the entire package was returned

5    to Lt. Johnson to notify Sgt. Boyer of the hiring decision.  (Johnson Decl. at ¶ 8; Dkt. 188 at 199.)

6    E.    Sgt. Boyer's Employment with SCSO

7           Sgt. Boyer began working as a SCSO deputy on January 1, 2012.  (Johnson Decl. at ¶ 9.)

8    Between the time of hiring and the time of his contact with plaintiff in 2014, Sgt. Boyer had no

9    disciplinary actions.  (*Id.*)

10                                  III.    DISCUSSION

11   A.    Motion for Summary Judgment

12          The County argues (1) it is entitled to discretionary immunity, and (2) there are no disputed

13   issues of material fact and it is entitled to judgment as a matter of law on plaintiff's negligent hiring

14   and retention claims.  As discussed below, the Court concludes that discretionary immunity does

15   not apply in this case and that disputed issues of material fact preclude summary judgment on the

16   negligence claims.

17          1.    *Summary Judgment Standard*

18          Summary judgment is appropriate when the "movant shows that there is no genuine dispute

19   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

20   56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The central issue is "whether

---

22   [13] Below Undersheriff Davis's note and signature, there is another handwritten note, "12-21-11 Advised @ 1620

23   Hours," followed by a signature.  (Dkt. 167 at 6.) Lt. Johnson stated in her declaration that this was Sheriff Lovick's
     signature. (Johnson Decl. at ¶ 8.)  During her deposition, however, she testified that the signature was her own and
     that Undersheriff Davis, not Sheriff Lovick, made the final hiring decision.  (Dkt. 188 at 199.)  Plaintiff's counsel
     agreed during oral argument that it appeared Undersheriff Davis made the final hiring decision.

**REDACTED** - 10

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by presenting evidence that negates an essential element of the nonmoving party's case, or by establishing that the nonmovant lacks the quantum evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the moving party bears the burden at trial, it can meet its initial burden by presenting evidence sufficient to demonstrate that no reasonable trier of fact could find for the nonmoving party; the evidence presented must establish beyond controversy every essential element of the claim. *Southern Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888-89 (9th Cir. 2003).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87. Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257.  Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

1          2.      *Discretionary Immunity*

2          In 1961, the Washington State Legislature abolished sovereign immunity.  *Evangelical*

3  *United Brethren Church of Adna v. State*, 67 Wash. 2d 246, 252 (1965) (citing RCW 4.92.090).

4  The Washington Supreme Court subsequently "recognized that, as a matter of public policy, not

5  every act, omission or decision of government should subject the governmental unit to potential

6  liability." *Stewart v. State*, 92 Wash. 2d 285, 293 (1979) (citing *Evangelical*).   The court thus

7  created an "extremely limited exception" to the general waiver of sovereign immunity for

8  discretionary governmental immunity.  *Id.*  "Under this exception, 'discretionary' governmental

9  acts are immune from tort liability whereas 'ministerial' or 'operational' acts are not." *Taggart v.*

10  *State*, 118 Wash. 2d 195, 214 (1992) (citing *Evangelical*, 67 Wash. 2d at 254-55).

11          In *Evangelical*, the Washington Supreme Court set forth four preliminary questions to

12  guide courts in determining whether a challenged decision qualifies as "discretionary": (1) Does

13  the challenged decision necessarily involve a basic governmental policy, program, or objective?

14  (2) Is the decision essential to the realization or accomplishment of that policy, program, or

15  objective as opposed to one which would not change the course or direction of the policy, program,

16  or objective?  (3) Does the decision require the exercise of basic policy evaluation, judgment, and

17  expertise on the part of the governmental agency involved?   (4) Does the governmental agency

18  involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make

19  the challenged decision? *Evangelical*, 67 Wash. 2d at 255.  The court held, "If these preliminary

20  questions can be clearly and unequivocally answered in the affirmative, then the challenged . . .

21  decision can, with a reasonable degree of assurance, be classified as a discretionary governmental

22  process and nontortious, regardless of its unwisdom." *Id.*  The court further held that whether

23

1    discretionary immunity applies "should present a question of law," but in some instances may raise

2    a mixed question of law and fact.  *Id.* at 253.

3        Since *Evangelical*, the Washington Supreme Court has narrowed the discretionary

4    immunity exception.  *Taggart*, 118 Wash. 2d at 214.  In *King v. City of Seattle*, 84 Wash. 2d 239

5    (1974), *overruled on other grounds by City of Seattle v. Blume*, 134 Wash. 2d 243, 259-60 (1997),

6    the court explained that "the determination of the category into which a particular activity falls

7    should be guided by the purpose of the discretionary immunity doctrine," namely to prevent courts

8    from passing judgment on basic policy decisions that have been committed to coordinate branches

9    of government.  *Id.* at 246; *Bender v. City of Seattle*, 99 Wash. 2d 582, 588 (1983).  Thus, "to be

10   entitled to immunity, the state must make a showing that such a policy decision, consciously

11   balancing risks and advantages, took place."  *King*, 84 Wash. 2d at 246.  In addition, the basic

12   policy decision must be made by an executive level officer.  *Chambers-Castanes v. King County*,

13   100 Wash. 2d 275, 284 (1983) (holding that decision of whether to dispatch a police officer to the

14   scene of a crime was an "operational" decision not entitled to discretionary immunity); *see also*

15   *Mason v. Bitton*, 85 Wash. 2d 321, 328-29 (1975) (holding that decision by police officers in the

16   field whether to engage in a high speed chase was "operational" and not a basic policy decision);

17   *Taggart*, 118 Wash. 2d at 215 (holding that parole officers' supervisory decisions are "ministerial,"

18   not basic policy decisions); *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wash. 2d 107, 158

19   (1987) (distinguishing "the implementation of policy," which is not subject to discretionary

20   immunity, from "basic policy discretion").[14]

21       There is no Washington case addressing discretionary immunity in the hiring context.  The

22   County nevertheless asserts it satisfies the requirements.  (Dkt. 160 at 15-17; *see also* Dkt. 136 at

23

---

[14] Because discretionary immunity is court-created, the limitations on statutory immunity provided in RCW 4.24.470 do not apply here, as plaintiff argues.  (*See* Dkt. 187 at 17.)

1   7 (County's answer asserting discretionary immunity as an affirmative defense).)   As to the first

2   *Evangelical* factor, the County argues that the basic governmental objectives are set forth in RCW

3   41.14.010, which states that "the general purpose of this chapter is to establish a merit system of

4   employment for county deputy sheriffs and other employees of the office of county sheriff, thereby

5   raising the standards and efficiency of such offices and law enforcement in general." (Dkt. 160 at

6   15.) Second, the County contends that hiring decisions are essential to meeting this objective, and

7   the legislature has enacted several statutes laying out the requirements for hiring law enforcement

8   officers and authorized the Criminal Justice Training Commission to develop standards. (Dkt. 160

9   at 15 (citing RCW Chapters 41.14, 43.101; WAC Chapters 139-05, 139-07).)   Third, the County

10   argues that the standards for hiring deputies are laid out by statute and code, which implicitly, if

11   not explicitly, require the sheriff's office to exercise basic policy judgment involving its expertise,

12   judgment, and analysis in making hiring decisions. (*Id.* at 16.) Fourth, the County maintains that

13   the legislature vested the elected sheriff with the authority to hire in order to meet the objective of

14   RCW 41.14.010. (Dkt. 160 at 15 (citing RCW 36.16.070 (granting authority to employ deputies),

15   and *Osborn v. Grant Cty. By & Through Grant Cty. Comm'rs*, 130 Wash. 2d 615, 622 (1996)

16   (holding that sheriff has power to hire deputies)).)   Finally, the County argues that Deputy Reid,

17   Lt. Johnson, and Chief Miller each engaged in conscious balancing when they provided

18   recommendations explicitly highlighting both the positive and negative aspects of Sgt. Boyer's

19   application. (*Id.* at 16-17.) The County points to the fact that Lt. Johnson specifically flagged the

20   adverse sections of Sgt. Boyer's application so Undersheriff Davis could consider the potential

21   risks and rewards of hiring Sgt. Boyer. (*Id.* at 16.) According to the County, "There is no evidence

22   that the Sheriff's Office leadership did not consider the risks and advantages of hiring Sgt. Boyer

23   or did not perform a conscious balancing of risk and advantages." (*Id.* at 17.)

1    Plaintiff responds that the County's discretionary immunity argument effectively concedes

2 Undersheriff Davis had the discretion to hire or not hire Sgt. Boyer, which contradicts its

3 contention that it was statutorily required to hire him if he met the minimum requirements. (Dkt.

4 187 at 16.) Plaintiff further argues that the County's background investigation and hiring decision

5 were not policy decisions potentially subject to discretionary immunity. (*Id.* at 18.) Plaintiff relies

6 on *Stewart*, in which the plaintiff alleged that the State was negligent in designing a bridge where

7 a motor vehicle accident occurred. 92 Wash. 2d at 292. The Washington Supreme Court held that

8 discretionary immunity did not bar the jury from considering these claims because *Evangelical*'s

9 first and second questions, as modified by *King*, were not satisfied:

> The decisions to build the freeway, to place it in this particular location so as to
> necessitate crossing the river, the number of lanes—these elements involve a basic
> governmental policy, program or objective. However, these are not the elements
> which are challenged by appellant. Rather, appellant argues that once those
> governmental decisions were made they had to be carried out without negligent
> design of the bridge or of the lighting system. Negligent design was not essential
> to the accomplishment of the policy, program or objective.

14 *Id.* at 294. Plaintiff claims that as in *Stewart*, he is not challenging a basic policy decision. (Dkt.

15 187 at 18.) According to plaintiff, the only basic policy at issue is the "merit system" created by

16 RCW 41.14. (*Id.*) Plaintiff claims he is not alleging the State was negligent when it created the

17 statutory requirements, rather he asserts that the County was negligent in *implementing* RCW

18 41.14.250 by negligently conducting its background investigation of Sgt. Boyer, determining that

19 he passed this investigation, and ultimately hiring and retaining him. (*Id.* at 18-19.) Plaintiff also

20 relies on *Taggart*, in which victims of assaults by parolees brought negligent supervision claims

21 against their attackers' parole officers. 118 Wash. 2d at 214-15. The Washington Supreme Court

22 held that the parole officers were not protected by discretionary immunity because their

23 supervisory decisions were "ministerial" and not "basic policy decisions." *Id.* at 215. Plaintiff

1    argues that he challenges "ministerial" decisions like in *Taggart*, namely Deputy Reid's failure to

2    fully investigate Sgt. Boyer's background, and Deputy Reid's and Lt. Johnson's failure to give

3    Sgt. Boyer's negative history proper weight. (Dkt. 187 at 19.)

4         The Court agrees with plaintiff that the decisions at issue here were operational or

5    ministerial.[15] As plaintiff points out, the Washington Supreme Court has held that whether to build

6    a freeway, where to put the freeway, and the number of lanes are basic policy decisions, whereas

7    the design of the freeway bridge crossing a river and the design of the lighting system for the

8    bridge do not involve policy. *Stewart*, 92 Wash. 2d at 294. The court has also held that the decision

9    to build a nuclear power plant is arguably a basic policy decision, whereas "the means by which

10   [the] decision [is] carried out" is not protected by immunity. *Haberman*, 109 Wash. 2d at 158.

11   The Court would agree that the City and County's decision to enter into the Interlocal, whereby

12   the County would hire City police officers who met its minimum qualifications, is a basic policy

13   decision similar to the decision to build a freeway or nuclear power plant in *Stewart* and

14   *Haberman*.  In contrast, the application of the Interlocal in making a hiring decision is an

15   implementation of a policy decision, and therefore operational in nature. Plaintiff challenges the

16   method by which the background investigation was conducted and the County's conclusion that

17   Sgt. Boyer passed the investigation and satisfied the Interlocal criteria. The County is not entitled

18   to discretionary immunity for the commission of these operational or ministerial activities. *See*

19   *Taggart*, 118 Wash. 2d at 215.

20        3.    *Negligent Hiring and Retention*

21        Under Washington law, to hold an employer liable for negligently hiring "an employee

22   who is incompetent or unfit, a plaintiff must show that the employer had knowledge of the

---

[15] Given this conclusion, the Court need not discuss plaintiff's argument that the County failed to show Undersheriff Davis consciously balanced the risks and advantages of hiring Sgt. Boyer.

1   employee's unfitness *or* failed to exercise reasonable care to discover unfitness before hiring or

2   retaining the employee." *Anderson v. Soap Lake Sch. Dist.*, 191 Wash. 2d 343, 356 (2018)

3   (emphasis added). "Negligent retention consists of . . . retaining the employee with knowledge of

4   his unfitness, or of failing to use reasonable care to discover it before . . . retaining him." *Id.* at

5   358 (internal quotation marks omitted, ellipses in original). The plaintiff also must show that the

6   negligently hired or retained employee proximately caused the plaintiff's injuries. *Carlson v.*

7   *Wackenhut Corp.*, 73 Wash. Ct. App. 247, 253 (1994) (cited with approval in *Anderson*, 191 Wash.

8   2d at 356).

9         Because there is no dispute that Sgt. Boyer caused plaintiff's injuries during the July 2014

10   incident, causation is readily satisfied. *See id.* (finding causation where there was no question the

11   employee caused the plaintiff's injuries). Likewise, there is no dispute that the County had

12   knowledge of Sgt. Boyer's background involving █████████████████████████████

13   ████████. The County argues that it is entitled to summary judgement because plaintiff cannot

14   show Sgt. Boyer was unfit given the time that had elapsed since these events, his stellar record as

15   a City police officer, and the fact that numerous people considered and found him fit for duty,

16   including Deputy Reid, Sgt. Aston, Lt. Johnson, Chief Miller, the psychologist, the polygraph

17   examiner, the medical examiner, and Undersheriff Davis. (Dkt. 160 at 11-13.) Plaintiff, however,

18   has put forth evidence creating a genuine issue of material fact as to Sgt. Boyer's fitness based on

19   his history. Scott DeFoe, plaintiff's expert witness, has opined that the County should not have

20   hired Sgt. Boyer based on the information the County knew about him at the time of hiring. (Dkt.

21   198 at 3-11.) Viewing the evidence in the light most favorable to plaintiff, a reasonable juror could

22

23

1   conclude that Sgt. Boyer was unfit and should not have passed his background investigation or

2   been hired by the County.[16]

3       The parties also dispute the second avenue by which a plaintiff may establish negligent

4   hiring and retention: failure "to exercise reasonable care to discover unfitness before hiring or

5   retaining the employee." *Anderson*, 191 Wash. 2d at 356.  The County argues that it cannot be

6   liable for negligent hiring because it complied with all requirements established by state statute

7   and code, which did not include a background investigation at the time it hired Sgt. Boyer.  (Dkt.

8   160 at 9-11.)  However, even where not expressly required by statute or code, background

9   investigations may be required where "the work is likely to subject third persons to serious risk of

10  great harm . . . ."  *La Lone v. Smith*, 39 Wash. 2d 167, 172 (1951) (quoted source omitted); *see*

11  *also Carlsen*, 73 Wash. Ct. App. at 256 ("A jury might conclude that it was reasonable for concert

12  patrons to look upon [the employee who assaulted a concert goer] as one authorized to perform

13  security functions, and that, therefore, [the employer] should have  more extensively examined

14  [his] background before hiring him.").  Law enforcement officers fall squarely into this definition.

15  The Court thus finds that the standard of care required SCSO to conduct a background

16  investigation.

17      The County asserts there is no evidence its background investigation was deficient, citing

18  the opinion of its expert witness that the investigation met or exceeded the industry standard.  (Dkt.

19  160 at 11; Dkt. 161-2 at 6.)  The County also maintains that no relevant information was unknown

---

[16] The Washington Supreme Court's decision in *Matter of Simmons*, 190 Wash. 2d 374 (2018), which the County cites, does not require a different result.  In *Simmons*, the court considered whether an applicant for the bar was fit or unfit to practice law given that her background included criminal convictions and drug use.  The court determined that sufficient time had elapsed between her prior conduct ending in 2011 and her 2017 application to show she was fit to practice law.  *Id.* at 386-87.  Given that *Simmons* did not involve a negligent hiring claim, the Court concludes that it does not provide a basis upon which to find in the County's favor as a matter of law.  The question of Sgt. Boyer's fitness should be considered by a jury.

1  to the SCSO at the time it hired Sgt. Boyer and that SCSO's leadership duly considered the

2  information in the background investigation. (Dkt. 160 at 11.) As plaintiff argues, however, there

3  are disputed issues of material fact regarding the adequacy of the investigation and the information

4  conveyed to Undersheriff Davis that preclude summary judgment on this issue.  Lt. Johnson

5  testified that Deputy Reid should have followed up on inconsistencies he discovered. (Dkt. 188 at

6  206 (Johnson testimony that "if there's any questions, if there's any differences between what is

7  divulged and what the police report says," the background investigator should follow up).)  There

8  are at least three inconsistencies in the record that Deputy Reid did not investigate further.

9

10

11

12

13

14

15

16

17  Because

18  Deputy Reid's memo does not accurately reflect the second two inconsistencies, his superiors did

19  not have the opportunity to take them into account or ask the deputy to conduct further

20  investigation.  In addition, as noted above, the Court must assume that the Arlington police report

21  was not included in the final application packet Undersheriff Davis reviewed and therefore he did

22  not have the opportunity to learn the details of this assault prior to making the hiring decision.

23  Viewing this evidence in the light most favorable to plaintiff, the Court concludes that a reasonable

**REDACTED** - 19

1   jury could find the County's investigation was inadequate to discover whether Sgt. Boyer was fit

2   to serve as a law enforcement officer.[17]

3       *Anderson*, which the County highlighted during oral argument, does not require a different

4   result.  In *Anderson*, the plaintiff argued that the defendant school district negligently retained a

5   basketball coach because of his disregard for and violation of school policies regarding students

6   and alcohol.  191 Wash. 2d at 358.  According to the plaintiff, the district failed to adequately

7   check the coach's background because the school principal could not recall whether he contacted

8   the coach's references.  *Id.* at 358-59.  The court held that even assuming no one checked the

9   coach's references, the plaintiff failed to present any evidence showing that the references knew

10  the coach gave alcohol to minors or that this was a fact the district would have reasonably

11  discovered had it contacted his references.  *Id.* at 359.  The court also noted that the district ran a

12  background check, which did not uncover anything that would indicate the coach was unfit.  *Id.*

13  Unlike in *Anderson*, where there was no evidence suggesting the coach was unfit, Sgt. Boyer's

14  application and SCSO's background investigation disclosed information that raised or should have

15  raised questions regarding his fitness to serve as a law enforcement officer.  The background

16  investigation also revealed inconsistencies that Deputy Reid did not follow up on or disclose to his

17  superiors.  Given this record, the Court concludes a jury must decide whether the County failed to

18  exercise reasonable care to discover unfitness prior to hiring Sgt. Boyer.

19

20  ─────────────────

21  [17] Plaintiff also argues that investigation was inadequate because the County used an undertrained, brand new background investigator to conduct the investigation, pointing to the fact that Deputy Reid received four hours of training on conducting background investigations and that this was either his first or second investigation. (Dkt. 187 at 18-20.)  But the mere fact that this was Deputy Reid's first or second background investigation does not support the

22  conclusion that he acted negligently.  Additionally, there is no evidence in the record that four hours of training is insufficient to instruct an experienced deputy how to properly conduct a background investigation.  Plaintiff's assertion that Deputy Reid was unqualified is unsupported conjecture insufficient to create a genuine issue of material

23  fact.  *See Hernandez*, 343 F.3d 1112 (unsupported conjecture insufficient to defeat properly supported motion for summary judgment).

1    B.    Motions to Seal

2    "[T]he courts of this country recognize a general right to inspect and copy public records

3    and documents, including judicial records and documents." *Nixon v. Warner Communications,*

4    *Inc.*, 435 U.S. 589, 597 (1978) (footnotes omitted).  The right is justified by citizens' interest in

5    "keep[ing] a watchful eye on the workings of public agencies." *Id.* at 598.  There is a "strong

6    presumption in favor of access to court records." *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331

7    F.3d 1124, 1134 (9th Cir. 2003).  To overcome this presumption when dispositive motions and

8    related attachments are at issue, the party seeking to seal the records must meet the "compelling

9    reasons" standard. *Id.* (quoting *Foltz*, 331 F.3d at 1135).  To do so, "the party must articulate

10   compelling reasons supported by specific factual findings that outweigh the general history of

11   access and the public policies favoring disclosure, such as the public interest in understanding the

12   judicial process." *Id.* at 1178-79 (internal citation, quotation, and alterations omitted).  Then "the

13   court must conscientiously balance the competing interests of the public and the party who seeks

14   to keep certain judicial records secret." *Id.* at 1179 (internal quotation and alteration omitted).

15   "After considering these interests, if the court decides to seal certain judicial records, it must 'base

16   its decision on a compelling reason and articulate the factual basis for its ruling, without relying

17   on hypothesis or conjecture.'" *Id.* (quoted source omitted).  Compelling reasons generally exist

18   when the "'court files might have become a vehicle for improper purposes,' such as the use of

19   records to gratify private spite, promote public scandal, circulate libelous statements, or release

20   trade secrets." *Id.* (quoting *Nixon*, 435 U.S. at 598).  "The mere fact that the production of records

21   may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not,

22   without more, compel the court to seal its records." *Id.*  The compelling reasons standard must be

23

1    met "even if the dispositive motion, or its attachments, were previously filed under seal or

2    protective order." *Id.*

3        The County[18] seeks to have the following maintained under seal: documents related to the

4    Arlington assault, including the police report and Cascade District Court sentence form (Dkt. 162);

5    emails between counsel for the parties regarding the Arlington assault and one other incident in

6    Sgt. Boyer's past (Dkt. 188 at 227-229); documents that were part of Sgt. Boyer's SCSO and City

7    of Snohomish application packages and background investigations (Dkts. 164, 165, 167-169, 188

8    at 3-160); excerpts from the depositions of Deputy Reid, Lt. Johnson, Sgt. Boyer, Ms. Wilson, and

9    Mr. DeFoe, which discuss information Sgt. Boyer disclosed in his applications and as a part of the

10   background investigations (Dkt. 188 at 162-225, 231-264); Mr. DeFoe's expert report, which

11   discusses the same type of information (Dkt. 189); and unredacted versions of the County's motion

12   for summary judgment and plaintiff's opposition brief, which include the same type of information

13   (Dkts. 160, 187). (*See* Dkts. 158, 183.)

14       The Court finds that compelling reasons do not justify the sealing of the documents related

15   to the Arlington assault. (Dkt. 162.) The County seeks to seal these records under the Washington

16   Criminal Records Privacy Act ("CRPA"). The CRPA provides that "[c]onviction records may be

17   disseminated without restriction," but the statute limits the dissemination of "[c]riminal history

18   record information which includes nonconviction data." RCW 10.97.050. The statute defines

19   "nonconviction data" as "all criminal history record information relating to an incident which has

20   not led to a conviction or other disposition adverse to the subject, and for which proceedings are

21   no longer actively pending." RCW 10.97.030(8). "Criminal history record information" is defined

22   as "information contained in records collected by criminal justice agencies, other than courts, on

23

---

[18] There are two pending motions to seal. The County filed the first, and plaintiff filed the second at the request of the county, although he disagreed that the documents should be filed under seal. (*See* Dkt. 183 at 1-2.)

1  individuals, consisting of identifiable descriptions and notations of arrests . . . or other formal

2  criminal charges, and any disposition arising therefrom . . . ." RCW 10.97.030(2). "Conviction

3  or other disposition adverse to the subject" expressly includes "a dismissal entered after a period

4  of probation . . . ." RCW 10.97.030(2). Sgt. Boyer was sentenced to 12 months probation for the

5  Arlington assault and then the charges against him were dismissed.  Thus, these records are not

6  protected by the CRPA and should not be maintained under seal.  *See State v. Riley*, 143 Wash.

7  Ct. App. 41, 45 (2008) (holding that a conviction that led to a dismissal entered after a period of

8  probation was not protected by the CRPA as nonconviction data).

9      Likewise, compelling reasons do not justify sealing counsel's email exchange regarding

10  the Arlington assault, which plaintiff filed to establish a material fact regarding whether the

11  Arlington police report was included in the final application packet given to Undersheriff Davis.

12  (Dkt. 188 at 227-229.)  But rather than unsealing the document currently on the docket, the Court

13  deems it more appropriate for plaintiff to file an unsealed version of the email exchange that redacts

14  references to events in Sgt. Boyer's past other than the Arlington assault.

15      With respect to the remaining documents at issue, however, the Court has carefully

16  considered the parties' briefing and finds compelling reasons to maintain them under seal at this

17  stage in the litigation.   The sensitive nature of the personal information contained in these

18  documents—including but not limited to events that occurred when Sgt. Boyer was a minor,

19  nonconviction data, and applications for public employment—and the potential injury to Sgt.

20  Boyer and his family from disclosure of these documents outweigh the public's interest at this

21  time.  In addition, as the Court recommends denying the motion for summary judgment, this case

22  is likely to proceed to trial, at which time the parties will be able to revisit what information should

23

be admitted and presented to the public.  The parties also may move to unseal the documents currently maintained under seal, as appropriate.

IV.    CONCLUSION

The Court GRANTS in part and DENIES in part the motions to seal (Dkts. 158, 183). The Clerk shall maintain the seal on Docket Numbers 160, 164, 165, 167-169, and 187-189.  The Clerk shall remove the seal on Docket Number 162 on **December 11, 2019**, unless objections to this order are filed by that date.  Also by **December 11, 2019**, plaintiff shall file an unsealed redacted version of the email exchange regarding the Arlington assault.

The Court RECOMMENDS that the County's motion for summary judgment (Dkts. 159, 160) be DENIED.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 13, 2019**.

Dated this <u>27th</u> day of November, 2019.


Mary Alice Theiler
United States Magistrate Judge